IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| MARY KELLY SUTTON, JOHN HUMISTON, MARY TALLEY BOWDEN, MARK BRODY, RICHARD WILKINSON, PHYSICIANS AND PATIENTS RECLAIMING MEDICINE,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERATION OF STATE MEDICAL BOARDS, INC., KATIE TEMPLETON, KENNETH SIMONS, MEDICAL BOARD OF CALIFORNIA, KIMBERLY KIRCHMEYER, RHODE ISLAND BOARD OF MEDICAL LICENSURE AND DISCIPLINE, NICOLE ALEXANDER-SCOTT, TEXAS MEDICAL BOARD, SHERIF ZAAFRAN, MASSACHUSETTS BOARD OF REGISTRATION IN MEDICINE, JULIAN ROBINSON, NEW YORK STATE BOARD FOR PROFESSIONAL MEDICAL CONDUCT, ANDREW MERRITT, MEDICAL LICENSING BOARD OF INDIANA, JOHN STROBEL, WASHINGTON MEDICAL COMMISSION, CLAIRE TRESCOTT, CHARITY DEAN,<br><br>Defendants. | No. 4:25-cv-01230-P<br><br>**FIRST AMENDED COMPLAINT** |

Respectfully submitted,
Plaintiffs,
By their attorneys,

Ilya I. Feoktistov
Nayeem N. Mohammed

DATED: June 14, 2025.

## INTRODUCTION

1. On April 30, 2022, Defendant Federation of State Medical Boards, Inc. ("FSMB"), the umbrella nongovernmental organization of all the physician licensing agencies in the fifty United States and their overseas territories, kneecapped scientific progress in the medical field by banning every licensed physician in the country from publicly disagreeing with what the FSMB's national leadership considers to be the medical field's prevailing scientific consensus.

2. In a policy document approved on April 30, 2022 by a secret vote of the FSMB House of Delegates, and titled, "Professional Expectations Regarding Medical Misinformation and Disinformation" (hereinafter "FSMB Censorship[1] Policy"), the FSMB fundamentally redefined the term "scientific evidence."

3. Since the start of the Scientific Revolution, scientific evidence has been defined as observations of physical phenomena that are rendered into general theory by inductive reasoning—with the general theory capable of falsification by any observations that the general theory fails to predict.

4. The FSMB's definition corrupts "scientific evidence" into mere consensus dogma, where any attempt at falsification turns to heresy against the consensus:

> *Scientific Evidence*
>
> Information from peer-reviewed journals, methodologically-sound clinical trials, nationally or internationally recognized clinical practice guidelines, or other consensus-based documents that receive broad acceptance from the medical and/or scientific communities.

---

[1] The term "censorship" is used here in the broadly legal sense of the "inspect[ion of] publications, films, and the like for objectionable content." *See* censor (n.), Black's Law Dictionary (10th Ed.).

5. Pursuant to the FSMB Censorship Policy, licensed American physicians are subject to professional discipline for giving the proverbial "second opinion":

> Recommendations regarding proposed or potential treatments of a medical illness or condition must be supported by the best available scientific evidence or prevailing scientific consensus. . . . When medical information is conveyed, whether in a clinical setting or in public through electronic means or otherwise, it must be based upon the best available scientific evidence. Where no such evidence exists, physicians must proceed very cautiously and only when there is a compelling rationale for the proposed treatment and justification of its use in relation to the patient's symptoms or condition. Novel, experimental or unproven interventions should only be considered and proposed when traditional, accepted and proven treatment modalities have been tried and failed. In such instances, there must still be a basis in theory or peer-acknowledged support for such practices. If justification based on scientific evidence is not present, disciplinary action by a state medical board may be warranted.

6. The FSMB Censorship Policy calls on state and territorial medical boards to adopt "a specific policy on misinformation . . . in light of the increased prevalence of, and harm caused by, physician-disseminated misinformation in this ongoing pandemic."

7. According to the FSMB Censorship Policy:

> When adjudicating cases regarding misinformation and disinformation, state medical boards are encouraged to consider the full array of authorized grounds for disciplinary action in their Medical Practice Acts. . . . State medical boards should not be dissuaded from carrying out their duty to protect the public by concerns about potential challenges to disciplinary decisions when these decisions are based on sound regulatory considerations for public protection.

8. The FSMB Censorship Policy defines "misinformation" as medical or other "[h]ealth-related information or claims that are false, inaccurate or misleading, according to the best available scientific evidence at the time."

9. The FSMB Censorship Policy defines "disinformation" as a sub-category of misinformation "that is spread intentionally to serve a malicious purpose, such as financial gain or political advantage."

10. Financial gain and political advantage are not malicious purposes.

11. For those state and territorial medical boards concerned about "facing challenges on First Amendment grounds for disciplinary action that restricts a physician's right to speech," the FSMB Censorship Policy provides several pretextual "[a]dditional grounds for disciplinary action that could relate to the dissemination of misinformation but are not necessarily directly related to fraud or deceit":

- Failure to adequately obtain informed consent by not providing adequate or truthful information to patients about proposed treatments.
- Failure to adhere to an applicable standard of care.
- Engaging in conduct that is likely to bring the profession into disrepute (unprofessional conduct).
- Engaging in unethical conduct by harming the public.
- Using experimental forms of therapy without proper informed patient consent, without conforming to generally accepted criteria or standard protocols, or without proper periodic peer review of results.

12. The FSMB Censorship Policy concludes:

> The dissemination of misinformation in the clinic or in public is a clear ethical violation—it endangers public health, undermines the quality of care, and damages the reputation of the medical profession. The harm is even greater when it comes to disinformation, as this implies the physician is knowingly misleading the public for personal gain. A policy which expressly prohibits physicians from disseminating misinformation or engaging in disinformation is thus a reasonable restriction on professional conduct.

13. The FSMB Censorship Policy is the national outgrowth of regulatory content- and viewpoint-based speech suppression campaigns against government-disfavored physician speech that originated in the State of California between 2017 and 2021.

14. Because of California's outsized role in the national public health response to the COVID-19 pandemic, Defendant California regulators—Kimberley Kirchmeyer, Charity Dean, and the Medical Board of California, in joint action with the FSMB, have been able to introduce speech suppression policies into the regulation of medicine nationwide.

15. Plaintiffs are a group of five physicians who have been disciplined by seven separate state medical licensing authorities, acting upon agreements with the FSMB, for conveying valid medical information that dissented from what the licensing authorities in their states considered to be the prevailing scientific consensus.

16. All five physicians commonly integrated non-standard medical treatments in their medical practices.

17. Such "integrative medicine" practices, also called "complementary" or "alternative" medicine, bring together conventional and unconventional approaches in a coordinated way, with an emphasis on treating the whole person rather than just one organ system.Two of the Plaintiff physicians, Mary Kelly Sutton and John Humiston, were disciplined during the COVID-19 pandemic by the medical boards of California, Massachusetts, New York, and Indiana for stating their shared professional opinion that a family history of adverse reactions to childhood immunizations may be a good reason to exempt a child from such immunizations.

18. Three others, Mark Brody, Mary Talley Bowden, and Richard Wilkinson were disciplined during the COVID-19 pandemic by the medical boards of Rhode Island, Texas, and Washington respectively.

19. Dr. Brody was disciplined for questioning the safety and effectiveness of COVID-19 vaccines in an email newsletter that he sent to his patients shortly after the first COVID-19 vaccine received emergency use authorization from the Food and Drug Administration.

20. Dr. Bowden was disciplined for providing expert testimony in state court against the prevailing scientific consensus on the safety and effectiveness of the drug ivermectin in treating COVID-19.

21. Dr. Wilkinson was disciplined for blog posts on his clinic's website downplaying the severity of the COVID-19 pandemic, promoting the use of ivermectin to treat COVID-19 over the COVID-19 vaccine, and criticizing the government's response to the COVID-19 pandemic.

22. It is not this Court's responsibility to protect non-consensus viewpoints within the medical profession from reasonable peer skepticism or even dogmatic rejection. It is, however, this Court's constitutional duty to ensure that such viewpoints are not subject to professional discipline under the color of state law.

## PARTIES

### A. Mary Kelly Sutton

23. Plaintiff Mary Kelly Sutton ("Dr. Sutton") received her medical degree from the University of Missouri School of Medicine in 1971.

24. Dr. Sutton obtained her licenses to practice medicine in New York in 1982, in California in 1993, and in Massachusetts in 2015.

25. Dr. Sutton practiced a form of integrative medicine called anthroposophic medicine, which is guided by principles recognizing the autonomy, dignity, and self-reliance of patients in her care. Many anthroposophic physicians respect patients' rights to refuse treatment, believe in proper informed consent as a standard of care, and do not engage in coercion of the patient.

26. Anthroposophic medicine is not "anti-vaccine" and does not support "anti-vaccine" movements. At the same time, many anthroposophic physicians believe that the scientific evidence supports a more circumspect and critical view of certain specific vaccines and of the current pediatric immunization schedule, as well as the development of improved, safer vaccines. Anthroposophic physicians calculate the benefits of vaccination based on the harms caused by the disease that a specific vaccine is intended to prevent.

**B. John Humiston**

27. Plaintiff John Humiston ("Dr. Humiston") received his medical degree from the Medical College of Wisconsin in 1995, and an undergraduate degree from the University of Wisconsin.

28. Dr. Humiston obtained his licenses to practice medicine in California in 2003 and in Indiana in 2018.

29. After medical school, Dr. Humiston served in the Navy as a battalion surgeon in the U.S. Marine infantry (stateside in peacetime), and as the department head of outpatient medicine at the former U.S. Naval Air Station's Naval Hospital in Keflavik, Iceland.

30. Dr. Humiston practiced "functional medicine," a form of integrative medicine that is based on the idea that every patient is unique and that many factors such as family history, lifestyle, and environment interact with each other. Functional medicine physicians provide "patient-centered" care, which means they spend time learning about a patient, her lifestyle, medical history, family history, and needs in order to find a personalized solution to the patient's health problems.

31. For treatment, functional medicine doctors often first recommend positive changes to diet, exercise, sleep, and stress reduction. However, if there is an immediate medical

need, functional medicine doctors can also prescribe medication and recommend conventional medical procedures. Functional medicine still relies on tools such as blood tests, allergy tests, and genetic testing.

**C. Mark Brody**

32. Plaintiff Mark Brody ("Dr. Brody") received his medical degree from the Columbia College of Physicians and Surgeons in 1986, and a cum laude undergraduate degree from Harvard College in 1979.

33. Dr. Brody obtained his licenses to practice medicine in Rhode Island and Massachusetts in 1991.

34. Dr. Brody practiced child and adult psychiatry, as well as general integrative medicine.

35. As an integrative medicine practitioner, Dr. Brody aimed for the restoration of health, not just disease management, and treated the person, not the disease. While he prioritized the use of safe alternative treatments, he sometimes used pharmaceuticals, as well as lab tests and imaging studies when medically necessary. Dr. Brody believes that modern medicine has come to rely on lab tests and imaging studies excessively, diminishing unwisely the role of the history, physical examination, and the therapeutic relationship in the process.

36. Dr. Brody's treatment and assessment process incorporated eclectic approaches, including biomedical, psychotherapeutic, homeopathic, nutritional, and energetic modalities such as Bowenwork.

**D. Mary Talley Bowden**

37. Plaintiff Mary Talley Bowden received her medical degree summa cum laude from the Medical College of Georgia in 1998, and a magna cum laude undergraduate degree from the University of North Carolina, Chapel Hill in 1994.

38. Dr. Bowden obtained her license to practice medicine in Texas in 2003.

39. Dr. Bowden specializes in otolaryngology and sleep medicine.

40. In 2019, Dr. Bowden opened a solo boutique ear, nose, and throat practice, using a non-traditional business with a health spa level of focus on exceptional customer service.

41. Though many of Dr. Bowden's otolaryngologist colleagues have become full-time surgeons, she enjoys the nonsurgical side of her specialty and has a reputation for being conservative in taking patients to the operating room.

42. Dr. Bowden's practice offers as much on-site diagnostics and treatment as possible to spare patients the inconvenience of scheduling services elsewhere. She does breathing treatments, allergy testing, sinus CT scans, and sleep testing. She has a phlebotomist for lab work and IVs, and when the pandemic hit, she offered rapid testing for COVID, flu and other viruses, with much faster turnaround times than the big medical diagnostic services in her area.

**E. Richard Wilkinson**

43. Plaintiff Richard Wilkinson received his medical degree from Loma Linda University in California, in 1976.

44. Dr. Wilkinson obtained his license to practice medicine in Washington in 1977.

45. Dr. Wilkinson became focused on alternative/integrative medicine in 1977 when he, along with 4 other physicians, created Total Health Foundation—a live-in lifestyle center aimed at reversing disease by practicing healthy life-style choices.

46. Dr. Wilkinson specializes in environmental medicine, long having been concerned about the environmental impact of chemicals found in food, water, homes and air on human

health. He has served as president and vice president of the American Academy of Environmental Medicine.

47. Dr. Wilkinson has lectured both stateside and abroad for the American Academy of Environmental Medicine, the American College for Advancement in Medicine (ACAM,) the Broda Barnes Research Foundation, the American Academy of Anti-Aging Medicine (A4M,) the Nevada Homeopathic Medical Society and the Stromboli Conference on Aging and Cancer.

48. Dr. Wilkinson's work has been published in "Alternative Medicine, The Definitive Guide," "The Townsend Letter," and "Aging Matters Magazine."

49. In his practice, Dr. Wilkinson ensures to look at all factors of new patients' lives in order to be able to diagnose the problems in their lifestyle and environment that may be causing their health problems. In addition, Dr. Wilkinson provides new patients with routine and comprehensive testing, including blood work and tests for environmental contaminants or infections. He uses drugs when necessary, but relies mostly on the wider integrative medicine toolkit.

**F. Physicians and Patients Reclaiming Medicine**

50. Plaintiff Physicians and Patients Reclaiming Medicine ("PPRM") is a 501(c)(3) non-profit organization bringing together patients, medical professionals, and attorneys to work collaboratively in defending and upholding medical rights and freedoms, as well as in helping each other achieve better health, medical care, and quality of life.

51. PPRM's core mission is to restore integrity to medical practice and establish patient-physician autonomy, consistent with patients' faiths, medical histories and personal philosophies, as a fundamental right.

52. PPRM members pay yearly dues, with membership allowing physicians and patients to participate in and lead initiatives that empower patients to reclaim their medical rights.

53. PPRM member physicians believe that practicing medicine requires patient-specific enhancements and adjustments to general standards. General mandates, guidelines, "standards of care," "best practices," and other consensus-based documents cannot provide the right answer in every detail to every issue for every patient and their specific medical history and needs. Physicians often need to fill the gaps. And, such general rules and consensus standards should never be followed blindly, ignoring the patient's specific medical history and needs. What is good for one person or for many people is not necessarily good for a specific patient.

54. PPRM works to defend the constitutional right of all physicians to speak freely to their patients and to speak publicly on any topic and from a viewpoint that honors the doctor-patient relationship.

55. PPRM members include physicians who wish to convey to their patients and to the public medical information that contradicts the prevailing scientific consensus in the medical profession.

56. PPRM member physicians are afraid of retaliation by their medical boards if they are named in this First Amended Complaint.

57. PPRM members include patients who wish to seek and receive independent, uncensored advice and treatment from the patient's chosen physician.

58. PPRM members include patients who wish to receive their health care services from integrated medicine practitioners instead of conventional medicine practitioners.

59. Verna Verspieren, of Texas, is a PPRM member who consulted with Plaintiff Mary Kelly Sutton while living in Fair Oaks, California and after moving to Texas, until Dr. Sutton's medical licenses were revoked and she could no longer practice as a medical doctor.

60. Verna preferred obtaining her health care from Dr. Sutton over conventional medicine providers she had seen in the past because they had limited recommendations which did not heal her conditions, leaving her in cycles of illness that affected her personal and professional life; while Dr. Sutton healed Verna's conditions.

61. Verna's three oldest children suffered adverse effects from childhood vaccination. Dr. Sutton documented this family history, as well as a genetic mutation in Verna's youngest son that was responsible for an increased risk of such adverse effects. Dr. Sutton's willingness to document this need for a vaccine exemption allowed Verna's youngest son to continue attending his schools of choice in California and in Texas.

62. Verna wishes to continue receiving medical care and information from Dr. Sutton, but cannot do so because Dr. Sutton no longer can practice as a medical doctor in any of the states she had been licensed to do so.

63. Cherrish Castaneda, of California, is a PPRM member who consulted with Plaintiff Mary Kelly Sutton until Dr. Sutton's medical licenses were revoked and she could no longer practice as a medical doctor.

64. During Cherrish's pregnancy in 2020-21, she faced workplace conditions that required prolonged use of face masks to prevent COVID-19 transmission, despite Cherrish having preexisting asthma, anxiety-related neurological symptoms, and respiratory limitations.

65. Dr. Sutton did not dismiss those concerns, evaluated Cherrish as an individual patient, documented concerns related to her symptoms and oxygen saturation, and advocated for

medically-appropriate accommodations for face mask use based on Cherrish's personal health circumstances. This advocacy allowed Cherrish to continue navigating pregnancy, work, disability-related limitations, and daily life more safely. Without Dr. Sutton's advocacy, Cherrish's health, employment, and ability to function as a mother would have been significantly compromised.

66. When Dr. Sutton lost her California medical license, Cherrish's family lost more than access to a particular physician. They lost their advocate. Cherrish's family now receives care through large institutional conventional healthcare systems with rotating providers, who provide a fundamentally different health care experience that is less preferrable to Dr. Sutton's health care services.

67. Cherrish wishes to continue having Dr. Sutton as her physician and medical advocate, but cannot do so because Dr. Sutton no longer can practice as a medical doctor in any of the states she had been licensed to do so.

**G. Federation of State Medical Boards**

68. Defendant Federation of State Medical Boards, Inc. ("FSMB"), is a Nebraska non-profit corporation, with offices in Euless, Texas and Washington, D.C.

69. The FSMB's Articles of Incorporation, Bylaws, and Public Policy Compendium comprise the FSMB's rules and regulations.

70. The FSMB is organized "in perpetual existence" for several purposes, including to

> study, determine, advocate and/or advance the adoption and maintenance, by the District of Columbia, the several states of the United States and its territories and insular possessions, of adequate and uniform standards for licensure in medicine and/or in the healing arts, and of proper administrative and enforcement provisions and in such practice acts, and to study, determine, advocate and/or advance the interstate and interjurisdictional endorsement of medical licensure on such terms and under such conditions as the organization may determine desirable to protect and promote uniformity in the administration of medical practice acts.

71. Membership in the FSMB is limited to "any board, committee or other group in any state, territory, the District of Columbia or possession of the United States of America that is empowered by law to pass on the qualifications of applicants for licensure to practice allopathic or osteopathic medicine or to discipline such licensees."

72. In 2022, there were seventy "Member Medical Boards" of the FSMB, which includes separate state licensing boards for osteopathic medicine, as well as U.S. overseas territories with their own medical licensing boards.

73. Except as otherwise provided in its Bylaws, "[t]he rights, duties, privileges and obligations of a member of the FSMB may be exercised only by a Member Medical Board."

74. Pursuant to the FSMB Bylaws, the organization's "House of Delegates is the official public policy-making body of the FSMB"; and "[t]he right to vote at meetings of the House of Delegates is vested in, and restricted to, Member Medical Boards," with each board receiving one vote.

75. Individual persons who are appointed by their state government to serve on a Member Medical Board automatically become "Board Member Fellows" of the FSMB during their service on the board, and for thirty-six months after leaving the board. After the thirty-six-month period, Board Member Fellows become "Honorary Fellows."

76. Each Member Medical Board also may designate one of its executive officers as a "Staff Fellow" of the FSMB. The Staff Fellow becomes an Honorary Fellow when no longer employed by the board.

77. Lastly, each Member Medical Board may designate one or more additional employees or staff members to be Associate Member(s) of the FSMB for the length of their employment by the medical board.

78. The roster of Board Member Fellows, Staff Fellows, and Associate Members serves as the recruitment pool for FSMB functionaries, who comprise its Officers, Directors, and Committee Members.

79. Only Board Member Fellows may serve as the five Officers of the FSMB, who appoint and define the duties of Committee Members, as well as preside at the meetings of the House of Delegates and Board of Directors.

80. In between Annual Meetings of the House of Delegates, control and administration of the FSMB is vested in the Board of Directors, which acts for the FSMB as a whole.

81. The FSMB's Board of Directors is composed of the five Officers, nine Directors elected by the House of Delegates from among Board Member Fellows, and two Staff Fellows.

82. The FSMB maintains an extensive "Public Policy Compendium," which contains various FSMB rules and regulations with varying degrees of binding language addressed towards state medical boards and physicians.

83. The FSMB exercises coercive control over its Member Medical Boards through disciplinary measures. Pursuant to the FSMB's Bylaws, "[t]he Board of Directors, on behalf of the House of Delegates, may enforce disciplinary measures, including expulsion, suspension, censure and reprimand" against a Member Medical Board.

84. Member Medical Boards may be subject to discipline for failure "to comply or act in accordance with [the FSMB] Bylaws, the Articles of Incorporation of the FSMB, or other duly adopted rules or regulations of the FSMB."

85. Member Medical Boards also may be subject to discipline for failure "to comply with any contract or agreement between the FSMB and such member or with any contract or agreement of the FSMB that binds such member."

86. Any "decision to expel a Member Medical Board" is taken by the Board of Directors and ratified by the House of Delegates.

87. An expelled medical board may apply for reinstatement to membership in the FSMB, and any decision by the Board of Directors to accept or reject an expelled medical board's application for reinstatement is final.

88. The FSMB's Bylaws or Articles of Incorporation do not provide any mechanism for Member Medical Boards to end their membership in the FSMB.

89. Together with the National Board of Medical Examiners, a non-profit group that shares much of the same leadership, the FSMB operates the United States Medical Licensing Examination ("USMLE").

90. USMLE has replaced traditional state board examinations, being required since 1992 of all U.S. and international medical school graduates as a prerequisite to medical licensure by every FSMB Member Medical Board.

91. The FSMB charges fees for taking the USMLE and for obtaining examination history reports.

92. In 2022, the FSMB reported $ 34,271,095 in tax-exempt revenue as its share from operating the USMLE instead of state medical boards.

93. In 2022, the FSMB reported an additional $ 7,904,744 in tax-exempt revenue from fees it charges medical school graduates for obtaining examination history reports.

94. Once a medical school graduate successfully passes the USMLE and applies to be licensed, sixty-seven of the seventy FSMB Member Medical Boards require or accept the FSMB's "Federation Credentials Verification Service" ("FCVS") to verify the graduate's examination history, personal identity, medical education, and postgraduate training as part of the state licensure process.

95. Physicians use their FCVS profiles for state medical licensure, hospital privileges, provider networks, and employment and professional memberships.

96. In 2022, the FSMB reported $ 14,497,786 in tax-exempt revenue from operating the FCVS.

97. The FSMB maintains the "Physician Data Center" ("PDC"), a centralized database of license and sanction information for physicians licensed by its Member Medical Boards.

98. In 2022, the FSMB reported $ 2,088,386 in tax-exempt revenue from operating the PDC.

**H. Katie Templeton**

99. Defendant Katie Templeton ("Templeton") serves as the vice president of the Oklahoma State Board of Osteopathic Examiners ("OSBOE"), served as OSBOE's president between 2020 and 2022, and has been a member of OSBOE since 2014.

100. In 2020, Templeton was elected by the FSMB House of Delegates to the FSMB Board of Directors and has served on various FSMB committees.

101. During 2021-2022, Templeton served as the chair of the FSMB's Ethics and Professionalism Committee, and led the development of the FSMB Censorship Policy while in that capacity.

102. In 2023, Templeton was elected by the FSMB House of Delegates as the chair of FSMB's Board of Directors, to serve during 2024.

103. As of the date of this Complaint, Templeton serves on the FSMB Board of Directors as the "immediate past chair."

**I. Kenneth Simons**

104. Defendant Kenneth Simons ("Simons") served as the chair of the Wisconsin Medical Examining Board ("WMEB") between 2013 and 2020.

105. In 2017, Simons was elected by the FSMB House of Delegates to the FSMB Board of Directors and has served on various FSMB committees.

106. In 2020, Simons was elected by the FSMB House of Delegates as the chair of FSMB's Board of Directors, to serve during 2021.

107. During 2022, Simons served on the FSMB Board of Directors as the "immediate past chair."

108. Simmons practices conventional medicine.

**J. Medical Board of California**

109. Defendant Medical Board of California ("MBC") administers California's Medical Practice Act pursuant to California's Business and Professions Code, § 2000 *et seq*.

110. The MBC consists of fifteen members, of whom seven are "public members." Members of the board, except the public members, may be appointed only from persons licensed as physicians and surgeons in California.

111. The physician members of the MBC practice conventional medicine.

112. Pursuant to California's Business and Professions Code, § 2018, the MBC has the power to adopt, amend, and repeal any "regulations as may be necessary to enable it to carry into effect the provisions of law relating to the practice of medicine" in the state.

113. Pursuant to California's Business and Professions Code, § 2082, the MBC's functions include ensuring that applicants for medical licensure possess the proper credentials for licensing.

114. Pursuant to California's Business and Professions Code, §§ 2170-2186, the California Division of Licensure administers examinations of applicants for medical licensure to ascertain the applicant's fitness to practice medicine. According to § 2176, a uniform examination system, such as the specifically-named USMLE, may be used for such an examination.

115. Pursuant to California's Business and Professions Code, § 2020, the MBC "may employ an executive director exempt from the provisions of the Civil Service Act and may also employ investigators, legal counsel, medical consultants, and other assistance as it may deem necessary to carry this chapter into effect."

116. Pursuant to 16 California Code of Regulations, § 1302:

> Except for those powers reserved exclusively to the "agency itself" under the Administrative Procedure Act Section 11500, et seq. of the Government Code, the [MBC] delegates and confers upon the executive director of the [MBC], the assistant executive director, the chief of enforcement, or the chief of licensing, or his or her designee of each of those persons, all functions necessary to the dispatch of business of the [MBC] in connection with investigative and administrative proceedings under the jurisdiction of the [MBC] relative to denials of licensure.

117. One of the powers reserved under California's Administrative Procedure Act exclusively to the "agency itself" is holding a "hearing to determine whether a right, authority, license, or privilege should be revoked, suspended, limited, or conditioned" in a contested case.

118. Pursuant to California's Business and Professions Code, § 2224, the MBC

> may delegate the authority under this chapter to conduct investigations and inspections and to institute proceedings to the executive director of the board or to other personnel as set forth in Section 2020. The board shall not delegate its authority to take final disciplinary action against a licensee as provided in Section 2227 and other provisions of this chapter.

119. Pursuant to California's Business and Professions Code, § 2230, "proceedings against a licensee for unprofessional conduct" before the MBC are "prosecuted by the Senior Assistant Attorney General of the Health Quality Enforcement Section."

120. Pursuant to California's Business and Professions Code, § 2225.5, subpoenas "mandating the release of records" to the MBC for the purposes of a professional misconduct investigation are judicially enforced.

121. Pursuant to California's Administrative Procedure Act, Government Code, § 11523, the MBC's decision to take final disciplinary action against a licensee is subject to judicial review by means of "a petition for a writ of mandate in accordance with the provisions of the Code of Civil Procedure."

122. The MBC is an FSMB Member Medical Board.

123. The MBC is sued as its individual members in their official capacities.

**K. Kimberly Kirchmeyer**

124. Between 2013 and 2019, Defendant Kimberly Kirchmeyer ("Kirchmeyer") was employed as the executive director of the MBC pursuant to California's Business and Professions Code, § 2020.

125. Between 2018 and 2019, Kirchmeyer was an Associate Member of the FSMB, a member of the FSMB's Advisory Council of Board Executives, the chair of the FSMB's Federation Credentials Verification Service Advisory Council, and a member of the FSMB's State Board Advisory Panel to the USMLE.

126. On October 8, 2019, California Governor Gavin Newsom appointed Kirchmeyer as the director of California's Department of Consumer Affairs, which is the MBC's parent agency; and Kirchmeyer occupies this role as of the date of this Complaint.

127. Kirchmeyer is sued in her personal capacity.

**L. Rhode Island Board of Medical Licensure and Discipline**

128. The Rhode Island Board of Medical Licensure and Discipline ("RIBMLD") was created within the Rhode Island Department of Health ("RIDOH") by Rhode Island General Laws, § 5-37-1.1, with the power to regulate the practice of medicine in Rhode Island.

129. RIBMLD is composed of thirteen members appointed by the Rhode Island governor, with the director of RIDOH serving as chairperson of the board.

130. Six of the RIBMLD's members must be licensed physicians, five must be non-physician public members, and one must be a hospital administrator.

131. The physician members of the RIBMLD practice conventional medicine, and the hospital administrator member administers a hospital where primarily conventional medicine is practiced.

132. Pursuant to Rhode Island General Laws, § 5-37-1.2, three members of RIBMLD serve as an "examining committee," which recommends to the full board "applicants for licensure to practice allopathic or osteopathic medicine who meet all requirements for licensure."

133. Applicants for licensure are required to provide proof of their credentials, as well as "pass in a satisfactory manner any examination that the board may require."

134. Pursuant to Rhode Island General Laws, § 5-37-1.3, RIBMLD has the power to "investigate all complaints and charges of unprofessional conduct against any licensed

physician or limited registrant and hold hearings to determine whether those charges are substantiated or unsubstantiated."

135. Pursuant to Rhode Island General Laws, §§ 5-37-1.3, 5-37-6, subpoenas issued by the RIBMLD or its committees are judicially enforced.

136. The RIBMLD is an FSMB Member Medical Board.

137. The RIBMLD is sued as its individual members in their official capacities.

**M. Nicole Alexander-Scott**

138. Between 2015 and 2022, Defendant Nicole Alexander-Scott ("Alexander-Scott") served as the director of RIDOH and the chairperson of RIBMLD.

139. Pursuant to Rhode Island General Laws, § 5-37-1.4, the director of RIDOH, who is appointed by the state's governor, has the power to "deny, revoke, or suspend licenses and registrations or discipline licensees in accordance with the provisions of this chapter."

140. Pursuant to Rhode Island General Laws, § 5-37-7, any "person whose license or limited registration to practice medicine has been revoked or suspended by the director or board, or is aggrieved by the decision of the board and/or director, has the right of judicial review of the decision of the board and director."

141. Between 2015 and 2022, Alexander-Scott served as a Board Member Fellow of the FSMB.

142. During the COVID-19 pandemic, Alexander-Scott was responsible for Rhode Island's COVID-19 vaccine distribution.

143. On February 15, 2021, Rhode Island's then-soon-to-be governor Dan McKee criticized the state's slow COVID-19 vaccine rollout, stating: "As Governor, my message to

everyone involved in the state's vaccine distribution effort will be . . . simple: Let's get shots in arms right now."

144. On January 13, 2022, Alexander-Scott resigned as the director of RIDOH due to disagreements with Rhode Island Governor Dan McKee concerning the state's COVID-19 vaccine and masking mandates.

145. Alexander-Scott practices conventional medicine.

146. Alexander-Scott is sued in her personal capacity.

**N. Texas Medical Board**

147. The Texas Medical Board ("TMB") is composed of nineteen members appointed by the state's governor, with the advice and consent of the senate, to regulate the practice of medicine in Texas pursuant to the Texas Medical Practice Act, Texas Occupations Code, § 151.001 et seq.

148. Twelve TMB members must be physicians licensed in Texas, while seven members represent the public.

149. The physician members of the TMB practice conventional medicine

150. Pursuant to Texas Occupations Code, §§ 155.002, 155.011, the TMB is responsible for credentialling applicants for a license to practice medicine, and for administering its own licensing examination or accepting one of five other examinations, including the USMLE.

151. Pursuant to Texas Occupations Code, § 153.007, the TMB has the power to issue subpoenas, enforceable by court order, as well as administer oaths and take testimony regarding any matter within its jurisdiction.

152. Pursuant to Texas Occupations Code, § 164.001, the TMB, "on determining a violation of [the Texas Medical Practice Act], a board rule or for any cause for which the board may refuse to admit a person to its examination or to issue or renew a license, . . . shall: (1) revoke or suspend a license; (2) place on probation a person whose license is suspended; or (3) reprimand a license holder."

153. Pursuant to Texas Occupations Code, §§ 164.0072, 164.009, judicial review is available both for the TMB, if aggrieved by any finding of fact or conclusion of law of an administrative law judge concerning disciplinary action by TMB, and for any "person whose license to practice medicine has been revoked or who is subject to other disciplinary action by" TMB.

154. The TMB is an FSMB Member Medical Board.

155. The TMB is sued as its individual members in their official capacities.

**O. Sherif Zaafran**

156. At all times relevant to this complaint, Sherif Zaafran ("Zaafran") has served as the president of TMB and as an advisor for the U.S. Food and Drug Administration ("FDA").

157. At all times relevant to this complaint, Zaafran has served as a Board Member Fellow at the FSMB.

158. From 2023 to the date of this complaint, Zaafran also has served as one of the nine elected members of FSMB's Board of Directors.

159. Zaafran is active on social media, where he often engages in political debate with other users and criticizes scientific opinions that lacked broad acceptance from the medical and/or scientific communities.

160. Zaafran practices conventional medicine.

161. Zaafran is sued in his personal capacity.

**P. Massachusetts Board of Registration in Medicine**

162. The Massachusetts Board of Registration in Medicine ("BORIM") is composed of seven Massachusetts residents appointed by the governor, and tasked with making rules and regulations concerning the practice of medicine, pursuant to Massachusetts General Laws Chapter 13, § 10.

163. Five BORIM members must be physicians licensed in Massachusetts, while two members represent the public.

164. The physician members of the BORIM practice conventional medicine.

165. Pursuant to Massachusetts General Laws, Chapter 112, §§ 2, 3, the BORIM must obtain satisfactory proof of a medical license applicant's credentials, and must administer licensing examinations that are "sufficiently thorough to test the applicants' fitness to practice medicine."

166. Pursuant to Massachusetts General Laws, Chapter 112, § 5,

> Upon request of [the BORIM's] complaint counsel for the production of evidence at any stage of an investigation, pursuant to this chapter and regulations of [BORIM] promulgated thereunder, witnesses may be summoned and document production may be compelled by subpoenas or subpoenas duces tecum issued at the direction of the chairman of [BORIM] or his designee.

167. The BORIM has the authority, under Massachusetts General Laws Chapter 112, § 5, after investigation and a hearing pursuant to the Massachusetts Administrative Procedure Act, to "revoke, suspend, or cancel" a physician's license to practice in Massachusetts upon finding that the physician "practice[ed] medicine fraudulently, or beyond its authorized scope, or with gross incompetence, or with gross negligence on a particular occasion or negligence on repeated occasions."

168. Massachusetts General Laws, Chapter 30A, § 14 provides for judicial review of the BORIM's decision to revoke, suspend, or cancel a physician's license to practice in Massachusetts in the state's Superior Court.

169. The BORIM is an FSMB Member Medical Board.

170. The BORIM is sued as its individual members in their official capacities.

**Q. Julian Robinson**

171. In 2022 and 2023, Julian Robinson served as the chair of the BORIM.

172. In 2022 and 2023, Julian Robinson served as a Board Member Fellow at the FSMB.

173. Robinson practices conventional medicine.

174. Robinson is sued in his personal capacity.

**R. New York State Board for Professional Medical Conduct**

175. In New York, the traditional physician credentialling and examination functions are carried out by the New York State Board of Medicine pursuant to New York Education Law, § 6524, which also authorizes the collection of fees for physician examinations.

176. Physicians are disciplined by a separate board, called the New York State Board for Professional Medical Conduct ("NBPMC"), which operates within the state's Department of Health by New York Public Health Law, § 230.

177. The NBPMC is composed of no fewer than twenty-five members appointed by the New York Commissioner of Health with various levels of involvement by other New York government entities in the appointment decision.

178. Eighteen NBPCM members must be physicians licensed in New York, while seven members represent the public.

179. Sixteen physician members of the NBPCM may practice conventional medicine, while at least two must dedicate a significant portion of their practice to non-conventional medical treatments.

180. As of December 31, 2023, the NBPMC consisted of sixty-two physician and twenty-seven non-physician public members.

181. Pursuant to New York Public Health Law, § 230, NBPMC, by the function of its committees on professional conduct, has the power to investigate physicians and conduct disciplinary proceedings in matters of professional misconduct.

182. A NBPMC committee on professional conduct comprises two physician members and a public member of NBPMC.

183. Pursuant to New York Public Health Law, § 230, the NBPMC's executive secretary,

> with the specific approval of a committee on professional conduct of the board shall have the power to issue subpoenas requiring persons to appear before the board and be examined with reference to a matter within the scope of the inquiry or the investigation being conducted by the board and produce books, papers, records or documents pertaining thereto.

184. Pursuant to New York Public Health Law, § 230-a, NBPMC, by the function of its committees on professional conduct, has the power to impose penalties on physicians, such as revoking licenses to practice medicine in New York.

185. Pursuant to New York Public Health Law, § 230-c and New York Civil Practice Law and Rules, § 7801, the decision of a NBPMC committee on professional conduct is subject to judicial review through actions in the nature of writs of certiorari to review, mandamus or prohibition.

186. Both the New York State Board of Medicine and NBPMC are FSMB Member Medical Boards.

187. The NBMPC is sued as its individual members in their official capacities.

**S. Andrew Merritt**

188. Defendant Andrew Merritt ("Merritt") served as the chairman of the NBPMC committee on professional conduct that revoked Dr. Sutton's license to practice medicine in New York.

189. At the time that Merritt served as the chairman of the NBPMC committee on professional conduct that revoked Dr. Sutton's license to practice medicine in New York, Merritt served as a Board Member Fellow at the FSMB.

190. Merrit practices conventional medicine.

191. Merritt is sued in his personal capacity.

**T. Medical Licensing Board of Indiana**

192. The Medical Licensing Board of Indiana ("MLBI") was created by Indiana Code, § 25-22.5-2.

193. The MLBI is composed of seven members appointed by Indiana's governor.

Six MLBI members must be physicians licensed in Indiana, while one member represents the public.

194. The physician members of the MLBI practice conventional medicine.

195. Pursuant to Indiana Code, § 25-22.5-2-7, the MLBI must "enforce physician credentialing rules concerning "education, residence, citizenship, training, and character for admission to an examination for licensure or by endorsement for licensure."

196. Pursuant to Indiana Code, § 25-22.5-4-1, the MLBI must "prepare and give, or approve the preparation and giving of, an examination which covers those general subjects and

topics, a knowledge of which is commonly and generally required, in the opinion of the board, to practice medicine or osteopathic medicine in Indiana."

197. Pursuant to Indiana Code, § 25-1-8-2, the MLBI must "establish by rule and cause to be collected fees for the . . . [e]xamination of applicants for licensure, registration, or certification."

198. Pursuant to Indiana Code, § 25-22.5-2-7 (8), the MLBI must "[a]dopt rules establishing standards for the competent practice of medicine, osteopathic medicine, or any other form of practice regulated by a limited license or permit issued under this article.

199. Pursuant to Indiana Code, §§ 25-1-7-2, 25-1-7-7, complaints against medical licenses are prosecuted by the attorney general "on behalf of the state of Indiana" and upon request of the MLBI, by majority vote.

200. Pursuant to Indiana Code, § 25-2.1-2-14, the MBLI has the power to "issue subpoenas to compel the attendance of witnesses and the production of documents."

201. Pursuant to Indiana Code, § 25-1-9-9, the MBLI may impose sanctions on physician practitioners, such as suspending or permanently revoking a practitioner's license to practice medicine in Indiana.

202. Pursuant to Indiana Code, § 4-21.5-5-3, the MBLI's decision to impose sanctions on physicians is subject to judicial review.

203. The MLBI is an FSMB Member Medical Board.

204. The MLBI is sued as its individual members in their official capacities

**U. John Strobel**

205. At all times relevant to the Complaint, John Strobel ("Strobel") served as the chair of the Indiana Medical Licensing Board.

206. On January 23, 2025, Strobel signed an order indefinitely suspending Plaintiff John Humiston's license to practice medicine in Indiana.

207. Strobel practices conventional medicine.

208. Strobel is sued in his personal capacity.

**V. Washington Medical Commission**

209. The Washington Medical Commission ("WMC") was established by Revised Code of Washington, § 18.71.015.

210. The WMC is composed of twenty-one members appointed by Washington's governor.

211. Thirteen WMC members must be physicians licensed in Washington, two WMC member must be physician assistants licensed in Washington, and six WMC members must be members of the public, at least two of whom may not be from the health care industry.

212. The physician and physician assistant members of the WMC practice conventional medicine.

213. Pursuant to Washington Revised Code, § 18.71.002, the WMC must "regulate the competency and quality of professional health care providers under its jurisdiction by establishing, monitoring, and enforcing qualifications for licensing, consistent standards of practice, continuing competency mechanisms, and discipline."

214. Pursuant to Washington Revised Code, § 18.71.070, the WMC must "prepare and give, or approve the preparation and giving of, an examination which shall cover those general subjects and topics, a knowledge of which is commonly and generally required of candidates for the degree of doctor of medicine conferred by approved colleges or schools of medicine in the United States."

215. Pursuant to Wash. Rev. Code Ann. § 18.130.050, the WMC has the authority to "investigate all complaints or reports of unprofessional conduct," "hold hearings," "issue subpoenas and administer oaths," "take or cause depositions to be taken," and "compel attendance of witnesses at hearings."

216. Pursuant to Wash. Rev. Code Ann. § 18.130.050, the WMC may impose sanctions on physician practitioners, such as suspending, permanently revoking, or restricting a practitioner's license to practice medicine in Washington, as well as requiring the satisfactory completion of a specific program of remedial education or treatment.

217. Pursuant to Wash. Rev. Code Ann. § 18.130.140, the WMC's decision to discipline a physician is subject to judicial review.

218. The WMC is an FSMB Member Medical Board.

219. The WMC is sued as its individual members in their official capacities.

**W. Claire Trescott**

220. At all times relevant to the Complaint, Claire Trescott ("Trescott") served as the chair of the WMC panel that restricted Dr. Wilkinson's license to practice medicine in Washington.

221. On August 12, 2023, Trescott signed an order placing Dr. Wilkinson's license to practice medicine in Washington on probation with conditions.

222. In 2016, Trescott became politically active, donating to Democratic Party causes during every presidential election year since. In 2016, she financially supported Hillary Clinton for president. In 2020, she financially supported Elizabeth Warren for president and donated to the Georgia U.S. Senate campaign of Jon Ossoff. In 2024, she gave to ActBlue, Democratic Power, Inc., and the Democratic Election Fund.

223. Trescott practices conventional medicine.

224. Trescott is sued in her personal capacity.

**X. Charity Dean**

225. Between 2011 and 2018, Defendant Charity Dean ("Dean") served as a local health officer in California's Santa Barbara County, first as a deputy and then as the chief.

226. Between 2018 and 2020, Dean served as the assistant director of the California Department of Public Health.

227. Dean was the central character profiled in Premonition, the prematurely-titled 2021 investigative journalism book about the COVID-19 pandemic by Michael Lewis of Vanity Fair.

228. Premonition details Dean's surprisingly outsized and, ultimately, misguided influence on the national COVID-19 pandemic response in the United States.

229. According to Premonition, Dean grew up in a "divisive and fear-based" church, whose "elders" ran her family's life and "made it clear they thought they, and they alone, were going to heaven."

230. When Dean was seven years old, missionaries in her church who came back from Africa told her about the contagious diseases they had encountered on their trip in people living there. According to Premonition:

> That experience had triggered an obsession: from then on, she'd wanted to know everything she could about disease[s] and the viruses that caused them. . . . She knew that her obsession with pandemic disease was unusual, even off-putting . . . [, but] from a very young age, when she was feeling low, she had cheered herself up by reading books on bubonic plague. The ones with the grisly drawings she liked best.

231. In Premonition, Dean claims she became a public health officer because, "[i]f you suspect [communicable] disease, you can do whatever the hell you want."

232. As a public health officer, Dean quickly realized that her obsession with pandemic disease was far harder to satisfy in the modern world than in the days of the bubonic plague. According to Lewis's narrative:

> Registering births and deaths. Inspecting restaurants. Counting bacteria in ocean water and swimming pools. Managing chronic diseases. None of that really interested [Dean]. . . . "I don't really care about obesity or diabetes," she said. "I actually don't give a shit about chronic disease. What I like is a crisis." What she more than liked was the kind of crisis that might be created by a communicable disease. She knew it sounded odd, but she'd been consumed by this interest since she was a small child. . . . Soon, Charity's purpose was clear, and not only to her but to anyone who watched her in action: she was put on earth to fight battles, and wars, against disease. . . . The most important thing Charity meant to stop, in her view, was people giving diseases to their fellow citizens.

233. According to Premonition: "A year into the pandemic, [Dean] thought of COVID as Mother Nature's gift to the country."

234. In 2020, Dean founded PHC Global, a consulting firm that promotes "biosecurity as a duty of care."

235. In 2021, PHC Global entered into a multimillion-dollar partnership with the U.S. Advanced Research Projects Agency for Health to create a "new weapon" that "could empower local public-health officers, who could use the genetic connections between viruses to reveal the risky social relationships between people."

236. Dean practices conventional medicine.

237. Dean is sued in her personal capacity.

**JURISDICTION AND VENUE**

238. This Court has original jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs' claims arise under 42 U.S.C. § 1983.

239. This Court has personal jurisdiction over all Defendants because Defendant FSMB's headquarters in Euless, Texas were the physical locus of all Defendants' agreement under the color of law to violate 42 U.S.C. § 1983, as pleaded in Count II.

240. Venue in the Northern District of Texas is appropriate pursuant to 28 U.S.C. 1391 because a substantial part of the events or omissions giving rise to the claim occurred in Euless, Texas.

241. Venue in the Northern District of Texas is otherwise appropriate pursuant to 28 U.S.C. 1391 because Defendant Federation of State Medical Boards resides in Euless Texas.

## FACTS

### I. California's Childhood Immunization Medical Exemption Pilot Project

242. On June 30, 2015, California codified a bill known as SB 277, amending California Health and Safety Code § 120325.

243. SB 277 repealed parents' ability to claim personal belief exemptions from childhood immunization requirements for enrollment in public and private K-12 schools.

244. California's pre-SB 277 personal belief exemption did not require the belief to be religious. Therefore, California parents who had a personal or family history of experiencing adverse immunization reactions were able to exempt their children for this reason simply on the basis of a personal lay belief.

245. SB 277 required California parents whose children had a personal or family history of adverse immunization reactions to obtain a statement by a licensed physician that immunization is not considered safe for these children.

246. The California Department of Public Health ("CDPH") interpreted SB 277 to mean that a compliant medical exemption statement should: a) "be in the form of a written statement

from a licensed physician (M.D. or D.O.)"; b) "state[ t]hat the physical condition or medical circumstances of the child are such that the required immunization(s) is not indicated"; c) "[state w]hich vaccines are being exempted"; d) "[state w]hether the medical exemption is permanent or temporary"; and e) "[include t]he expiration date, if the exemption is temporary."

247. Both the plain text and the legislative history of SB 277 show that the California legislature considered a family history of adverse immunization reactions to be an appropriate reason for exemption from childhood immunization requirements under SB 277.

248. The text of SB 277 conditioned public and private school attendance in California on a child obtaining either full immunization with the required vaccines or

> a written statement by a licensed physician to the effect that the physical condition of the child is such, or medical circumstances relating to the child are such, that immunization is not considered safe, indicating the specific nature and probable duration of the medical condition or circumstances, ***including, but not limited to, family medical history***, for which the physician does not recommend immunization.
>
> (Emphasis added.)

249. The emphasized text was added in an amendment by the bill's co-sponsor in California's lower chamber after extensive testimony from Californians with family histories of adverse immunization reactions. During a hearing on SB 277, the co-sponsor had stated:

> I'm a co-author; I want to support this; I ask you if you would consider putting in language not limited to, but for the exemptions to be offered in instances when a sibling or a family member has had an adverse reaction and if there's a—I know there isn't a very good test for it—but if there are any genetic dispositions that so parents would testify and say, "listen I have two kids who are quote unquote vaccine injured and I don't want my third one getting vaccinated."

250. In 2015, the prevailing scientific consensus within the California medical community concerning childhood vaccination requirements was that a family medical history of adverse vaccine reactions does not warrant exceptions from any childhood vaccination requirements.

251. In 2015, this California consensus corresponded to recommendations provided in tandem by a federal agency, the Advisory Committee on Immunization Practices ("ACIP") at the U.S. Centers for Disease Control ("CDC"), and by a non-profit corporation, the American Academy of Pediatrics ("AAP"), in its so-called "Red Book."

252. In 2025, the ACIP and AAP acrimoniously broke their consensus on childhood vaccination requirements, with each one questioning the credibility of the other.

253. Hereinafter, the Complaint will refer to "the pre-2025 ACIP/AAP consensus" in order to reflect the current lack thereof.

254. While prevailing in California, the pre-2025 ACIP/AAP consensus was not absolute, even in 2015.

255. In 2015, a significant minority of licensed California physicians disagreed with the pre-2025 ACIP/AAP consensus on exemptions, saw it as too restrictive, and believed that medical exemptions from school immunization requirements may be granted based on family history alone.

256. Plaintiffs Kelly Sutton and John Humiston were among this minority.

**II. Mary Kelly Sutton**

257. As SB 277 went into effect, Dr. Sutton began to see more pediatric patients whose primary care physicians or specialists refused to condone delaying or foregoing any

childhood vaccinations for any reason, including due to family history of adverse reaction to immunizations.

258. Parents of such pediatric patients reported adverse health effects that prior childhood vaccinations had on the patients or patients' relatives, including new allergies, immune response dysfunctions like autoimmune disease, and various severe inflammatory or neurological vaccine reactions.

259. Dr. Sutton developed a detailed personal and family history intake form, based on a template form for medical exemptions officially sponsored by the California District of the American Academy of Pediatrics and the California Association of Family Physicians.

260. Dr. Sutton also performed genetic tests on some of her patients to detect mutations that may increase the health risk of vaccination.

261. Dr. Sutton included all of the information required to comply with SB 277, as interpreted by the CDPH, on her patients' medical exemption statements if they qualified for an exemption under SB 277.

262. On March 10, 2016, the district nurse for the Goleta Union School District ("GUSD") in Santa Barbara County, California, wrote in an email to the district's assistant superintendent:

> I received a request for permanent medical exemption from a parent of an incoming GFS student. The doctor who signed it practices in Fair Oaks, CA (near Sacramento). Her name is Mary Kelly Sutton and she is a licensed MD. . . . I am not planning to challenge the one I received. It meets the criteria set by the CDE and SB 277. This is just a heads up that you may see more of these from this physician.

263. The email was forwarded to Santa Barbara's chief health officer, Defendant Charity Dean ("Dean").

264. Dean replied immediately:

> I will forward this information to Adriana Almaguer, our IZ [immunization] coordinator, who interacts directly with the schools so she has this MD on her radar in case we see more. Health Officers have been planning for this, and these MDs may get to be under scrutiny by the California Medical Board to determine if their medical exemptions are legitimate. I will personally be filing a complaint with the medical board if it appears an MD is issuing false medical exemptions.

265. Dean then immediately forwarded the email chain to the Santa Barbara County immunization coordinator, writing that a GUSD parent

> is aware of an MD near Sacramento issuing medical exemptions for children in SB (see below). Please let me know if you become aware of additional medical exemptions from any physician, particularly if they are out of county. That would be suspicious. We know that only 2 entities have authority over a physician in solo private practice: the Health Officer, and the California Medical Board. My plan, if I am suspicious that an MD is issuing false medical exemptions, will be to report the concern to the [Medical Board of California ("MBC")]. That is the only way to 'police' solo practitioners, and most definitely falls under the role of the [MBC] who issues licenses to all physicians in California. They will get to investigate the medical exemptions being issued and determine if there were legitimate grounds for an exemption.

266. On May 13, 2016, the California Conference of Local Health Officers (a statutory entity), the CDPH, and the MBC held a meeting on childhood vaccine medical exemptions.

267. According to the meeting summary, the meeting was "requested by Charity Dean" to discuss "SB 277 and potentially f[i]ctitious medical exemptions issued by California physicians," as well as the "California Medical Board process if a licensed physician is reported for issuing f[i]ctitious medical exemptions."

268. Dean and MBC's executive director, Defendant Kimberly Kirchmeyer ("Kirchmeyer") attended the meeting.

269. At the May 13, 2016 meeting, Dean urged MBC and all other California county public health departments to launch a state-wide campaign called the Medical Exemption Pilot Project ("MEPP"), pursuant to which:

> [Medical exemptions] with red flags will be documented and the issuing physician may be reported to the [MBC]. The [MBC] would then decide if they should investigate. This will allow data collection to see where the [medical exemptions] are coming from, what% of them list the reason, and other data to help us understand the effects of this law. To collect this data, each Health Officer would need to direct schools to send all [medical exemptions] to [the [public health department] for review. If every [local health jurisdiction] did this we could combine the data for an accurate statewide picture.

270. On June 16, 2016, Kirchmeyer emailed Dean, with the subject line "SB 277":

> [H]ere are the email addresses and phone number for both [MBC Chief of Enforcement] Christina Delp and myself in case anyone wants to send us an email or call with a complaint related to this issue. Lastly, I am going to provide you a link to the Board's website to file a complaint if individuals choose to go through the process. . . . We look forward to working together.

271. On July 7, 2016, Dean spoke at a CCLHO immunization branch roundtable meeting. The meeting included health officers from Alameda, Monterey, Shasta, Riverside, San Diego, and Orange Counties, among others, as well as representatives from the Health Officers Association of California ("HOAC," a non-profit organization) and CDPH.

272. Dean stated at the roundtable meeting:

> I certainly never intended to be leading the charge on this but I just want to tell you that, you know, I am not backing away from looking at these medical exemptions and collecting data. This is a new public health law and I absolutely want to look at how it is affecting my community. And we are completely moving forward in Santa Barbara County even though it's been an interesting process.

273. Another health officer stated: "There's also a systems level opportunity here too because I personally would like to smoke out these physicians who write these kinds of documents."

274. At the July 7, 2016 meeting, the CCLHO immunizations branch members passed a motion to "communicate formally in writing with CDPH in order to request guidance in a statewide consistent response to evaluating the impact essentially of the implementation

of SB277 specifically around medical exemptions and their validity and how that pattern changes."

275. While the CCLHO communications with CDPH proceeded, the county health officers and school nurses who agreed to participate in Dean's MEPP began filing complaints with the MBC against Dr. Sutton, among many other doctors

276. On information and belief, Dean asked Olivia Kasirye ("Kasirye"), the county health officer of Sacramento County, where Dr. Sutton's practice was located, to be the one to file a complaint with the MBC against Dr. Sutton.

277. On or about June 22, 2016, Kasirye obtained a medical exemption letter written by Dr. Sutton for a student attending a Sacramento school, with personal identifying information of the student left unredacted. The letter stated:

> My patient [name and date of birth] is medically exempt from all vaccines on a permanent basis due to personal history of neurologic vulnerability and family history of severe vaccine reaction and autoimmune disease. Vaccination constitutes a greater risk than benefit for this individual. This is a medical necessity. Thank you for your consideration on his behalf.

278. On June 22, 2016, Kasirye's secretary faxed the letter to Rashya Henderson, a supervising special investigator with the MBC's Complaint Investigation Office, noting that "Dr. Kasirye spoke to you about this letter."

279. On July 5, 2016, Dean emailed Kasirye: "Hi Olivia, If your County Counsel would like to ask questions about the MEPP, Mike Ghizzoni (Santa Barbara County's lead Counsel) said he is happy to personally take their call for an initial discussion."

280. On November 16, 2016, the chief nurse of the Fairfield-Suisun United School District ("FSUSD") in Solano and Napa Counties filed a complaint against Dr. Sutton.

281. MBC also assigned this complaint to Rashya Henderson.

282. The FSUSD nurse told Henderson that she

> was concerned because the information the parent provided regarding the child's health did not show a valid reason for a permanent medical exemption from all vaccines as the letter written by Dr. Sutton indicated. . . . [The nurse] stated that it was very rare to have a permanent exemption from all vaccines as Dr. Sutton indicated in the letter provided.

283. On February 23, 2017, MBC received a complaint from the assistant chief of pediatrics at Kaiser Permanente's Roseville Medical Center, stating that a Kaiser patient had been given an inappropriate vaccine exemption letter issued by Dr. Sutton.

284. On May 23, 2017, the Director of CDPH, Karen Smith, filed her own complaint against Dr. Sutton, claiming the complaint to be on behalf of the Shasta County public health office and the Shasta Union High School District chief nurse.

285. MBC assigned this complaint to Supervising Special Investigator Rashya Henderson as well.

286. The Shasta nurse provided Henderson with three medical exemption letters.

287. The first letter, from January 8, 2016 stated that the student had "personal history of neurologic disease, and family history of autoimmune disease, allergy, vaccine reactions, and neurologic disease."

288. The second letter, from July 29, 2016 stated that the student had "personal history of allergy and suspected vaccine reaction, and family history of autoimmune disease, allergy, neurologic disease, and suspected vaccine reaction."

289. The third letter, from December 6, 2016, stated that the student had "personal history of genetic defect and allergy, and family history of neurologic and autoimmune disease, suspected vaccine reaction, and allergy."

290. According to Henderson's investigative report, the Shasta nurse "was not aware of any medical indication that would support a vaccination exemption for these students."

291. On July 6, 2017, Kirchmeyer gave a PowerPoint presentation on MBC's "enforcement process" at a meeting of the CCLHO board of directors.

292. Charity Dean also attended the July 6, 2017 meeting, having become an at-large member of the CCLHO board.

293. At the July 6, 2017 CCLHO board of directors meeting with Kirchmeyer, California county health officers agreed that they would report their MEPP physician data to CDPH, whose officials would then report the data to Kirchmeyer or her deputies on the MBC staff in the form of complaints against the reported physicians.

294. In late 2018, Dr. Sutton moved to Rhode Island to live closer with family, and began practicing medicine in Massachusetts.

**III. John Humiston**

295. On information and belief, in early 2019, Dean and/or Kirchmeyer tipped Sacramento-based journalists from several newspapers across California to file public records requests for MEPP data collected by local schools.

296. A Sacramento-based reporter for the Los Angeles Times targeted Orange County's Huntington Beach City School District.

297. The Los Angeles Times reporter's request closely mirrored the categories of information that were being collected by Dean under the MEPP. The reporter asked for "[t]he name of medical professional who signed medical exemption," the date it was signed, any expiration date, "[t]he school name for the student with the medical exemption," "[t]he

physical condition or medical circumstances cited in the exemption," and "[w]hich vaccines were exempted."

298. A reporter for the Voice of San Diego requested the same information from the San Diego Unified School District.

299. Upon receiving the MEPP database records, multiple California newspapers then published stories critical of physicians who wrote the largest numbers of vaccine exemptions for children living in the newspapers' market areas.

300. Some newspapers, like the Voice of San Diego, placed the MEPP databases of physician names online, linking to the data in their stories.

301. Dr. Sutton's name was included in the Voice of San Diego database.

302. As a result of mass media coverage, members of the public began making complaints with the MBC against physicians identified in the published MEPP data, which greatly increased the numbers of physicians that MBC was then able to investigate.

303. Just from the Voice of San Diego coverage alone, the MBC launched professional misconduct investigations into thirty-one of the roughly 150 individual health care providers identified in the newspaper as physicians who have provided statements of medical exemption from childhood vaccines.

304. Plaintiff John Humiston ("Dr. Humiston") was among these thirty-one doctors.

305. According to MBC documents:

> In March 2019, [Rashiya] Henderson was assigned to investigate [Dr. Humiston] based on a complaint the board received related to a news article regarding the results of a public records request for information from the San Diego Unified School District (SDUSD) related to vaccination exemptions provided to school-aged children in the district. The complaint included a spreadsheet with a list of physicians who had provided the most vaccination exemptions for school-aged children in the district. Respondent was one of the top five physicians who had written the most vaccination exemptions.

306. California's Business and Professions Code, § 2224 prohibits the MBC from delegating "authority to take final disciplinary action against a licensee"; and Kirchmeyer initially had trouble convincing the actual appointed members of MBC to discipline physicians like Dr. Sutton and Dr. Humiston for writing medical exemptions based on family history of adverse vaccine reactions.

307. In contemporaneous board meetings where the subject was discussed, many MBC board members argued that the pre-2025 ACIP/AAP consensus criteria for appropriate exemptions from vaccination were too narrow because they failed to take into account "family history," "genetic predisposition supported by genetic testing," "epigenetics" (environmental factors affecting gene expression), and other risk factors of vaccination.

308. To overcome the MBC board members' initial opposition to disciplining doctors for writing medical exemptions based on reasons not recommended under the pre-2025 ACIP/AAP consensus, Kirchmeyer joined and enlisted the help of the FSMB's national leadership in Euless, Texas.

309. In 2018, Kirchmeyer became an Associate Member of the FSMB; and the FSMB then appointed Kirchmeyer to its Advisory Council of Board Executives.

310. On information and belief, while Kirchmeyer served as an Associate Member of the FSMB and a member of its Advisory Council of Board Executives, she and other members of the FSMB national leadership agreed at the FSMB national headquarters in Euless, Texas that the FSMB would pressure the MBC, as well as Member Medical Boards in other states with laws like SB 277, to discipline physicians for writing medical

exemptions from childhood vaccinations based on reasons not recommended under the pre-2025 ACIP/AAP consensus.

## IV. COVID-19 Vaccines

311. As the MBC proceeded with its investigations into Dr. Sutton and Dr. Humiston, SARS-CoV-2 appeared in China and developed into the global COVID-19 pandemic of 2020.

312. During the summer of 2020, aided by pandemic-era panic, as well as by the internal organizational groundwork laid by Kirchmeyer at the FSMB over the two previous years, FSMB's national leadership in Euless, Texas adopted California's physician censorship policies in a series of public statements culminating with the 2022 FSMB Censorship Policy.

313. On October 6, 2020, FSMB's national leadership in Euless, Texas issued the first such public policy statement, which implicitly threatened that its Member Medical Boards may discipline physicians who were not wearing face coverings while seeing patients, or who were "casting doubt with patients and the public about [the coverings'] effectiveness."

314. On December 11, 2020, the Food and Drug Administration ("FDA") issued an emergency use authorization ("EUA") to Pfizer, Inc., ("Pfizer") for the commercial distribution of the first COVID-19 vaccine in the United States.

315. On information and belief, on or about December 11, 2020, the FSMB's national leadership in Euless, Texas communicated to FSMB's Member Medical Boards that physicians who cast doubt with patients and the public on the safety and efficacy of all vaccines, and especially COVID-19 vaccines, should be disciplined; and the Member Medical Boards agreed to do so.

## V. Mark Brody

316. On or about December 14, 2020, Plaintiff Mark Brody ("Dr. Brody") emailed an electronic newsletter to his patients, in which he cast doubt on what the FSMB's national leadership considers to be the prevailing contemporary scientific consensus that the Pfizer COVID-19 vaccine was safe and effective.

317. In his email to patients, Dr. Brody claimed that he "will not be administering this vaccination to anyone" and recommended that his patients wait for more scientific evidence to become available before receiving COVID-19 vaccines:

> I am recommending to you, my patients, and to all others, including my own family and any friends who are interested, that they wait a minimum of 1 year before submitting to this experimental vaccine, to allow the time required to properly determine its safety and efficacy to pass, and to submit then only if the evidence conclusively demonstrates safety and efficacy. . . . Therefore, I urge you to forego this vaccination, pending better scientific data, and to urge all you know to be patient and await the data that will permit a careful reasoned decision about the vaccination to take place.

318. In the newsletter, Dr. Brody also stated his political opinions about the vaccine:

> It is my view that this vaccination constitutes a vast breach of the public trust, and an abdication of responsibility by government and public health authorities to protect the welfare of the citizens of our country. . . . How this could happen defies my understanding, but it likely constitutes a crime of commission or omission of the sort not observed since the Nazi experiments in World War II by Mengele and his associates, or at the Tuskegeee Institute in this country in the 1930's. While these crimes were identified and censured under the Nuremburg Code in the 1940's, they were limited to small populations, whereas the crimes now being committed are on a much vaster scale and affect the entire world.

319. On December 30, 2020, the Rhode Island Board of Medical Licensure and Discipline ("RIBMLD"), received a complaint about Dr. Brody's newsletter, "which letter the Complainant worried posed a public health risk," according to RIBMLD.

320. On information and belief, the complaint came from Defendant Carl Baum, M.D. ("Baum"), a professor of pediatrics and emergency medicine at the Yale School of

Medicine in nearby Connecticut, who had been forwarded Dr. Brody's newsletter by another individual.

321. Baum is a biased and extremely politicized advocate for full immunization who believes that all vaccines, including the flu vaccine, must be mandatory for children and adults "in the absence of a significant allergy to a vaccine component." According to Baum, all other vaccine exemption reasons are based on "misinformation."

322. In early 2020, Baum published articles and testified in support of Connecticut's H.B. 5044, which replicated California's 2015 SB 277 in banning religious childhood vaccination exemptions.

323. In early 2021, Baum again commented publicly in the media and the Connecticut General Assembly, this time linking the childhood vaccine issue with the COVID-19 vaccination effort of 2021:

> Last year, I told you that global pandemics are "not if, but when," and here we are, 1 year later, in the middle of the worst pandemic in a century. . . . So getting vaccinated when it's your turn will help in our collective struggle against dangerous, more infectious COVID variants.

324. On information and belief, FSMB's national leadership in Euless, Texas also learned of Dr. Brody's letter and demanded that RIBMLD discipline Dr. Brody for publicly disagreeing with the prevailing consensus concerning the safety or efficacy of the COVID-19 vaccine; and RIBMLD agreed to do so.

325. After RIBMLD received Baum's complaint against Dr. Brody, RIBMLD staff emergently reviewed the complaint and a subpoena was issued for Dr. Brody to appear before the investigative committee on January 7, 2021.

326. On April 14, 2021, Defendant Alexander-Scott issued a Consent Order to Dr. Brody.

327. According to the Consent Order, Dr. Brody was responsible for professional misconduct because: "multiple assertions contained within the letter [to patients about the COVID-19 vaccine] and repeated to the Investigative Committee [by Dr. Brody] were, on the whole, misinformed, revealing a general lack of expertise in the field, and, in several instances, were patently false."

328. Alexander-Scott faulted Dr. Brody for disagreeing with CDC claims about the COVID-19 vaccines.

329. Alexander-Scott found Dr. Brody's statement, "I foresee serious troubles ahead with this vaccination," to be "dangerously misleading because it [is] based upon the unsupported and objectively false premise that the development approval process for the vaccines is deficient."

330. Alexander-Scott consequently determined:

> Respondent violated R.I. Gen. Laws § 5-37.5(19), which defines "unprofessional conduct" as including, "incompetent, negligent, or willful misconduct in the practice of medicine, which includes the rendering of medically unnecessary services, and any departure from, or the failure to conform to, the minimal standards of acceptable and prevailing medical practice in his or her area of expertise as is determined by the board." Respondent's letter to his patients constitutes the practice of medicine and that letter was predicated upon misleading and false information. Further, the letter revealed Respondent's concerning lack of knowledge of basic medicine. Furthermore, the Investigative Committee determined that Respondent's confident and deliberate adherence to and repetition of the false claims, despite lack of expertise in the field, is likely to harm his patients to whom he has decidedly not presented to his patients [*sic*] a balanced discussion of the risks and benefits of the vaccines.

331. The Consent Order required Dr. Brody "to successfully pass the CPEP [Center for Personalized Education for Professionals] Probe course," which CPEP describes as:

> Intensive small group sessions [that] target participants' professional misconduct. . . Discussions and case analyses facilitate participant "probing" into why they went astray and recommitting to professional ideals. After the seminar,

> participants submit a final essay that shows understanding of the Program content and the ability to apply the content to the reasons for referral.

332. Pursuant to Alexander-Scott's order:

> Respondent's failure to successfully pass the CPEP Probe course by the end of 2021 (or by the scheduled completion time of the first-available course, if the first-available course is not scheduled to complete within 2021) shall result in the suspension of Respondent's license effective January 1, 2022, and Respondent shall not approach the Board for reinstatement until providing satisfactory evidence of successfully passing said course.

333. On January 4, 2021, Baum filed a fraudulent complaint with RIBMLD against Dr. Brody, in which Baum falsely accused Dr. Brody of having "ordered a course of chelation therapy for autism symptoms" for one of Dr. Brody's pediatric patients.

334. The pediatric patient was a Connecticut resident and Baum may have obtained the patient's medical records at Baum's own or at a third party's practice.

335. Baum falsely claimed that Dr. Brody had diagnosed autism in the patient.

336. Baum falsely claimed that the patient actually had "lead poisoning."

337. Dr Baum falsely claimed that Dr. Brody's care "may in fact prove harmful—or even fatal—to children."

338. Baum admitted that he had "not examined or met the child in question," but instead appealed to his own well-known authority as an expert in toxicology and lead poisoning in order to support his false claims.

339. There was no basis for Baum to have diagnosed the child with lead poisoning.

340. Dr. Brody's records actually showed that, during an initial intake visit on December 26, 2020, the child was assessed with "[s]low development," which Dr. Brody noted, "[m]ay be related to heavy metal poisoning, or other environmental and genetic factors." Dr. Brody did not make any assessment of autism in the patient.

341. Dr. Brody's records actually showed that Dr. Brody had prescribed the patient with a homeopathic remedy and a widely-available over-the-counter health supplement. Dr. Brody also recommended that the child's urine be tested for heavy metals prior to a follow-up appointment, just in case.

342. The child's guardian never returned for the follow-up appointment, and no test or therapy ever was performed.

343. After receiving Baum's second, fraudulent, complaint, RIBMLD subpoenaed additional records from Dr. Brody and appointed Baum as an expert to review them.

344. On July 14, 2021, Defendant Alexander-Scott suspended Dr. Brody from the practice of medicine for five years based on Baum's review of Dr. Brody's records, "with the provision that the balance of such suspension shall be erased upon [Dr. Brody] successfully passing an evaluation of clinical competency. . ."

**VI. FSMB Censorship Statement and FSMB Censorship Policy**

345. In May of 2021, FSMB Chair Kenneth B. Simons, M.D., tasked the FSMB's Ethics and Professionalism Committee ("EPC") in Euless, Texas, under the leadership of Defendant Katie Templeton, J.D. ("Templeton"), with studying "the issue of physician misinformation and disinformation."

346. On July 29, 2021, following Templeton and EPC's recommendations, the FSMB's Board of Directors in Euless Texas unanimously approved a public statement "in response to a dramatic increase in the dissemination of COVID-19 vaccine misinformation and disinformation by physicians and other health care professionals on social media platforms, online and in the media" (hereinafter "the FSMB Censorship Statement"):

> Physicians who generate and spread COVID-19 vaccine misinformation or disinformation are risking disciplinary action by state medical boards, including

> the suspension or revocation of their medical license. Due to their specialized knowledge and training, licensed physicians possess a high degree of public trust and therefore have a powerful platform in society, whether they recognize it or not. They also have an ethical and professional responsibility to practice medicine in the best interests of their patients and must share information that is factual, scientifically grounded and consensus-driven for the betterment of public health. Spreading inaccurate COVID-19 vaccine information contradicts that responsibility, threatens to further erode public trust in the medical profession and puts all patients at risk.

347. In the following weeks, the FSMB Censorship Statement garnered significant media attention due to a heavy public relations effort by the FSMB's media relations team, including coverage from CNN and other major news outlets.

348. The FSMB was mentioned in more than 1,400 news stories between October 15, 2021, and February 1, 2022.

349. Among the outlets covering the FSMB Censorship Statement were The New York Times, Politico, Chicago Tribune, Dallas Morning News, Washington Post, Los Angeles Times, CBS News, CNBC and many others.

350. The FSMB's social media post linking to the FSMB Censorship Statement was viewed 3.4 million times and engaged with (retweeted, liked, clicked on) more than 43,000 times.

351. The link to the FSMB Censorship Statement on FSMB.org was viewed more than 57,000 times.

352. On August 17, 2021, the Boston Globe reported about Dr. Brody's suspension in its "Rhode Island Crime" section, and quoted Carl Baum's false claims in the story.

353. On August 18, 2021, the medical news website MedPage Today interviewed FSMB's vice president of communications, who told the outlet:

> Our statement is a reminder to physicians that words have consequences and during a public health emergency like COVID-19, those words can mean life or death for patients. . . . [The statement] refers to any misinformation or

> disinformation that is being generated or spread by a physician whether it be in a private clinical encounter or shared publicly.

354. Dr. Brody was featured widely in the FSMB media relation team's work as an example of the consequences that physicians may face for publicly dissenting from what the FSMB's national leadership considers to be the contemporary scientific consensus concerning COVID-19 vaccines.

355. In an October 20, 2021 story, CNN quoted FSMB's president complaining that policing physician speech is difficult because medical boards "simply do not have the resources … to monitor what's happening on the internet or what's going on even in an individual patient encounter."

356. In the story, CNN reported that Dr. Brody was one of the only two "exceptions to the rule of impunity."

357. In October 2021, FSMB hosted an online Continuing Medical Education class titled, "Stopping the Spread: Disinformation and Its Impact on Physicians and Patients," with Templeton, and FSMB staffer located in Euless Texas, and Imran Ahmed, the founding CEO of a controversial pro-censorship organization called Center for Countering Digital Hate ("CCDH"). The class drew 279 participants.

358. Imran Ahmed's presentation was a diatribe featuring Dr. Brody:

> State medical boards have, I am sad to say, utterly, utterly failed the profession. They have not just failed to protect physicians, they have empowered the worst physicians among you. . . . Nearly three months ago, the FSMB put out a strongly worded statement warning that doctors who spread misinformation and disinformation risk losing their licenses. And what's happened since then? I ask from the position of a member of the public who wants action to be taken against doctors who disinform. Well, sadly, basically nothing. . . . ***Some state medical boards have taken action. Rhode Island took action against Mark Brody for sending letters.*** [Emphasis added.] But what is the difference between sending a letter and sending a tweet? And I'm sorry, but if your rules do not allow you to

> take action, then there's something wrong there. Both are purposeful communications designed to persuade patients, members of the public. The difference is that one is a guided bioweapon, a letter. The other is an indiscriminate weapon of mass destruction on social media platforms that refuse to take action against misinformation.

359. Templeton agreed, stating:

> we can't hide behind the First Amendment. We can't hide behind the law to avoid taking the hard stand. And we support our medical boards in making these hard decisions to protect the public. . . . And we call on the state medical boards to take these hard actions. . . . [M]ore likely than not, if they're disseminating false information on social media, they're also using that false information in their practice as well.

360. Khan replied:

> No one has a fundamental right to be licensed by a state medical board. You hold that decision making power in your hands. And the First Amendment should not be a consideration when it comes to considering the good character and conduct of a position when deciding whether or not to award them a license.

361. Many FSMB Member Medical Boards either adopted the FSMB Censorship Statement or crafted their own versions, and many major health organizations—ranging from the American Board of Medical Specialties to the American College of Physicians—created statements that often lauded or referred to the FSMB and its position.

362. During the fall of 2021, while the FSMB still was using him as an example of "doctors who misinform," Dr. Brody began working on his license reinstatement by taking the "CPEP Probe" course required by Alexander-Scott in his consent order.

363. The CPEP Probe course instructors required Dr. Brody to admit that his claims concerning the COVID-19 vaccine had been misinformation, and to recant these claims in a confessional essay.

364. Dr. Brody refused to do so.

365. On October 21, 2021, the day after he was featured in the CNN story on the FSMB Censorship Statement, Dr. Brody was given a failing grade in the CPEP Probe course. According to the instructors' grading report, Dr. Brody's essay

> lacks demonstration that Dr. Brody appreciates the concerns of the Board about the potential harms that could befall patients who receive false and misleading medical advice from a trusted health professional. . . He leaves the impression that the Board is concerned primarily with the use of "strong language" as opposed to also being concerned about the risk of harm to his patients by being provided false and misleading information. Dr. Brody could have demonstrated greater insight in this section by acknowledging that he failed to exhibit appropriate humility by not considering whether he had the requisite body of knowledge to accurately convey balanced and scientifically validated information to his patients about the approved COVID-19 vaccines. He also reveals a misinterpretation of professional autonomy through a failure to understand that standards of care are determined by the profession as a whole, not by any one individual.

366. On December 28, 2021, a writer for MedPage Today complained, in an article titled, "Worst COVID Liars Still Have Their Licenses," that Dr. Brody's license was suspended for only five years.

367. On January 1, 2022, RIBMLD suspended Dr. Brody's license indefinitely, with reinstatement possible only upon retaking and successfully completing the CPEP ethics course.

368. On the opposite coast, starting in late 2021 and early 2022, the FSMB Censorship Statement and the FSMB Censorship Policy finally forced MBC board members to start disciplining California physicians for writing statements of medical exemption from childhood vaccinations that disagreed with the pre-2025 ACIP/AAP consensus.

369. On December 8, 2021, effective January 7, 2022, MBC adopted an administrative law judge's proposed decision that Dr. Sutton's license to practice medicine in California should be revoked.

370. According to the decision, in relevant part:

> Business and Professions Code section 2234, included in the Medical Practice Act, provides that a licensee may· be subject to discipline for committing unprofessional conduct, which includes conduct that is grossly negligent (Bus. & Prof. Code, § 2234, subd. (b)), repeatedly negligent (Bus. & Prof. Code, § 2234, subd. (c)), or incompetent (Bus. & Prof. Code, § 2234, subd. (d)). Cause for discipline for gross negligence and repeated negligent acts in relation to Patients 1 through 8 was established. . . Respondent acknowledged issuing the vaccine exemptions at issue in this case, and acknowledged that these exemptions did not comply with the vaccine guidelines set forth by the ACIP and AAP. . . . She was in contact with other physicians who formed a group called Physicians for Informed Consent, and the group had the advice of counsel. At the legislative hearings [for SB 277], there had been discussions of genetics and family history, and respondent believed the law endorsed physicians exempting children from vaccination based on genetic mutations and family history, including family history of extended family members. Respondent believed that she was acting lawfully when she issued the exemptions, noting that the statute references "family medical history." . . . Her practice of eliciting an extensive family history and basing her exemptions on irrelevant information fell far outside the standard of care. Her view that the amended statute conferred complete discretion on physicians to ignore the ACIP and AAP guidelines was unreasonable and raises doubts about her commitment to practicing medicine in a manner consistent with patient and public safety. At hearing, respondent expressed a willingness to abide by the law, but also continued to defend her actions as reasonable and presented experts holding extreme views about vaccination. Respondent cannot be trusted to practice within the standard of care. In addition, respondent is no longer residing in California rendering probation impractical. Revocation is the only appropriate discipline.

371. At the end of 2021, as all five of the plaintiff doctors were in various stages of their disciplinary processes, FSMB and Templeton sent a draft version of the FSMB Censorship Policy to its Member Medical Boards for comment and review.

372. On February 1, 2022, FSMB's president and CEO, Humayun Chaudhry, together with Kenneth Simons, then the Chair of the FSMB's Board of Directors, held a virtual "town hall event" concerning the FSMB Censorship Policy, with participation limited "exclusively for the leadership of our state and territorial medical boards."

373. More than sixty individuals attended the town hall event.

374. Chaudhry appeared at the town hall event from his corner office in Euless Texas:







375. Chaudhary's location can be identified by the unique angular eave feature and the garbage container area visible both from Chaudhary's office window in the video and

from satellite imagery of the FSMB's Euless, Texas headquarters. The video also shows what appears to be heavy traffic in the background, which matches with satellite imagery (not pictured here) showing Highway 183 within Choudhary's camera angle.

376. According to Chaudhry's speech at the event:

> Recent prominent cases highlighted in the media as well as disciplinary actions taken by our member boards highlighted sort of the need for guidance beyond just a statement, and that's why the Ethics and Professionalism Committee has been working to put together a more comprehensive guidance, which, as I say, has already been submitted to you all for your comments and feedback."

377. According to Simons's speech at the event, the FSMB particularly desired that Member Medical Boards censor physician public speech:

> We brought in an outside attorney to talk to us about First Amendment, because that's where you're seeing a lot of misinformation is—you see in the press. You're seeing people put things up on their websites. You're seeing physicians who may or may not be licensed—you're seeing them put it up on Facebook or Meta, whatever they're calling it these days, that kind of thing. And so there was a bit of a concern at the end of the day that somehow, you know, this is influencing many people when, if you're a physician and you're practicing, in quotes, on Facebook as it were, and putting it out there as medical information, you have the ability to affect thousands and thousands of lives, obviously. So that's where I would be listening to my board attorney to see what is under your particular state statutes, might be appropriate to take disciplinary action against the physician.

378. Chaudhry claimed, "there are at least half a dozen state boards" that "are looking at their statutes and looking at ways of maybe strengthening some of their language related to professionalism or ethics" in order to target physicians' public speech:

> In many of the states, licensing boards are exploring how they may have to change some of the language in their statutes. The licensing boards and a number of state boards have said this in media interviews I've seen—have said, look, you know, our statutes were written at a time where we didn't have social media, where you could skirt just below the radar if you were making bizarre claims. But now we live in a world with, you know, social media where anybody, whether licensed or not, can make a claim or make a statement that is bizarre, that is not grounded in science or evidence, and instantly get 100,000 followers or 100,000 who tweet and spread it further, literally goes viral.

379. The MBC was one of the half dozen boards that Chaudhry was referencing.

380. On February 14, 2022, California legislators introduced AB 2098, which specified that it is "unprofessional conduct" for licensed California physicians "to disseminate misinformation or disinformation related to COVID-19, including false or misleading information regarding the nature and risks of the virus, its prevention and treatment; and the development, safety, and effectiveness of COVID-19 vaccines."

381. In a legislative findings section, AB 2098 stated that the legislation was necessary, in part, because:

> the Federation of State Medical Boards has released a statement warning that physicians who engage in the dissemination of COVID-19 vaccine misinformation or disinformation risk losing their medical license, and that physicians have a duty to provide their patients with accurate, science-based information.

382. Akin to the FSMB Censorship Policy, which was being developed in parallel by Templeton and the FSMB's Ethics and Professionalism Committee, AB 2098 defined misinformation as "false information that is contradicted by contemporary scientific consensus contrary to the standard of care."

383. In AB 2098, "[d]isseminat[ion]" was defined as "the conveyance of information from the licensee to a patient under the licensee's care in the form of treatment or advice."

384. On April 30, 2022, the FSMB House of Delegates voted to adopt the FSMB Censorship Policy on a secret vote.

385. On September 30, 2022, the California legislature passed AB 2098.

386. On January 25, 2023, in *Høeg v. Newsom*, 652 F. Supp. 3d 1172 (E.D. Cal. 2023), the U.S. District Court for the Eastern District of California enjoined the MBC and the

Osteopathic Medical Board of California from enforcing AB 2098 as facially void for vagueness under the Fourteenth Amendment.

387. The Eastern California District Court found 1) that AB 2098 "implicates First Amendment rights"; 2) that "[b]y its very nature, the standard of care applies to care, not information"; and 3) that "drawing a line between what is true and what is settled by scientific consensus is difficult, if not impossible."

388. The court asked rhetorically:

> For instance, who determines whether a consensus exists to begin with? If a consensus does exist, among whom must the consensus exist (for example practicing physicians, or professional organizations, or medical researchers, or public health officials, or perhaps a combination)? In which geographic area must the consensus exist (California, or the United States, or the world)? What level of agreement constitutes a consensus (perhaps a plurality, or a majority, or a supermajority)? How recently in time must the consensus have been established to be considered "contemporary"? And what source or sources should physicians consult to determine what the consensus is at any given time (perhaps peer-reviewed scientific articles, or clinical guidelines from professional organizations, or public health recommendations)? The statute provides no means of understanding to what "scientific consensus" refers.

389. On February 6, 2023, effective March 8, 2023, the MBC revoked Dr. Humiston's license to practice medicine in California for writing medical exemptions from childhood vaccinations based on reasons not recommended under the pre-2025 ACIP/AAP consensus.

390. The MBC agreed with its expert that the pre-2025 ACIP/AAP consensus recommendations "set forth the standard of care for physicians in the United States for when a vaccine exemption should be issued, and the scope of the vaccine exemption issued."

391. Thus, MBC found:

> [Dr. Humiston] argued that it was within his discretion to issue a vaccine exemption if he feels it is appropriate and without reference to the [AAP's] red book and CDC['s ACIP] guidelines. . . . [Dr Humiston] admitted that he not only disregarded the red book and CDC guidelines in the issuance of these four exemptions, but simply substituted his own judgment for that guidance. Accordingly, . . . [Dr. Humiston's] choice to do so was an extreme departure from the standard of care constituting gross negligence and repeated negligent acts.

392. By the time that Dr. Humiston was disciplined by the MBC, the FSMB Censorship Policy was in place. As suggested in the FSMB Censorship Policy, and as pioneered by RIBMLD against Dr. Brody, MBC found that Dr. Humiston also committed professional misconduct based on other, pretextual, grounds.

393. One of these pretextual grounds, as suggested in the FSMB Censorship Policy, is the use of "experimental forms of therapy without proper informed patient consent, without conforming to generally accepted criteria or standard protocols, or without proper periodic peer review of results."

394. Thus, after amending its original December 16, 2020 accusation against Dr. Humiston three times on July 14, 2021, January 19, 2022, and March 10, 2022, MBC's final accusation included allegations that Dr. Humiston refused to give benzodiazepine drugs to a patient who asked to go back on the drugs one month into an integrative drug detoxification treatment called NeuroRecover. Dr. Humiston instead recommended that the patient persevere with the treatment, which resulted in the breakdown of the physician-patient relationship.

395. The MBC thus found on February 6, 2023:

> Cause exists under Business and Professions Code section 2234, subdivision (b), to impose discipline [against Dr. Humiston]. Complainant established by clear and convincing evidence that respondent engaged in gross negligence with respect to his care and treatment of Patient A for failing to gradually reduce Patient A's antidepressant and benzodiazepine use over several weeks, failing to recognize that Patient A was suffering rebound withdrawal syndrome, and failing to provide

> appropriate treatment after Patient A's symptoms returned; and that respondent engaged in gross negligence with respect to his issuance of vaccine exemptions for Patient C, Patient D, Patient E, based upon his reliance on unsupported reasons for issuance of the exemption, based upon providing an exemption for all childhood vaccinations, and based upon his failure to have or document proper contraindications for all childhood vaccines; and that respondent engaged in gross negligence with respect to his issuance of vaccine exemptions for Patient F based upon providing an exemption for all childhood vaccinations, and based upon his failure to have or document proper contraindications for all childhood vaccines.

396. On July 13, 2023, the Massachusetts Board of Registration in Medicine ("BORIM") revoked Dr. Sutton's license to practice medicine in Massachusetts, finding:

> The Magistrate, relying on the California Board's findings, determined that the Respondent issued immunization exemptions to eight children for improper reasons and without completing appropriate examinations. He analyzed the statutory authority for the Respondent's discipline in California for "gross negligence" and "repeated negligence" and found them analogous to the provisions of G.L. c. 112, sec. 5(c) and 243 CMR 1.03(5)(a)(3), under which a physician may be disciplined for "gross negligence on a particular occasion or negligence on repeated occasions." He also noted that Massachusetts also requires certain immunizations for children entering school, absent a religious exception, or a physician's certification that he has 'personally examined such child' and believes the child's health would be endangered by the immunization. G.L. c. 76, sec. 15. The Magistrate concludes that the Respondent is therefore subject to reciprocal discipline in Massachusetts based on the discipline imposed by the California Board. . . . In adopting the Recommended Decision, the Board endorses the Magistrate's conclusions finding the basis for the California discipline to be similar to that for which a physician may be disciplined pursuant to Massachusetts law.

397. On September 7, 2023, BORIM also indefinitely suspended Dr. Brody's license to practice in Massachusetts "for having been disciplined by the Rhode Island Board of Medical Licensure and Discipline (RI Board) for reasons substantially the same as those set forth at G.L. c. 112, § 5 and 243 CMR 1.03(5), until "such a time when he can demonstrate he has fully and successfully complied with the RI Discipline and that his RI medical license is current and in good standing."

398. According to BORIM:

> The gravamen of Respondent's violations center around his false and misleading statements concerning the safety and efficacy of the COVID-19 vaccinations. Respondent misstated the safety and efficacy of the COVID-19 vaccinations and offered unsupported theories to his patients in advising them not to accept any COVID-19 vaccine, The Board has sanctioned misleading statements concerning specialty board certification, and for submitting falsified documents with license applications. Where a physician has falsely stated his specialty board credentials over time and to other entities in addition to the Board, the Board has imposed an indefinite license suspension to be stayed upon entry into a Probation Agreement requiring outside monitoring. Respondent's false and misleading statements to his patients are of a different species than those typically meriting Board discipline. Arguably his misstatement of the safety and efficacy of COVID-19 vaccines are more significant to maintaining public health and safety.
>
> (Internal citations omitted.)

399. On November 3, 2023, the New York State Board for Professional Medical Conduct ("NBPMC") revoked Dr. Sutton's license to practice medicine in New York pursuant to New York Education Law, § 6530, finding:

> In reviewing the facts cited by the Medical Board of California in the September 28, 2021 Decision, and the December 8, 2021 Order, the Hearing Committee is concerned over the Respondent's failure to adhere to applicable standards of care in issuing vaccine exemptions, in particular, her failure to follow prescribed guidelines of the ACIP and the AAP, her failure to obtain and review patient records and prior medical history for each patient for whom she issued a letter of vaccine exemption, her failure to document that she informed patients of the risks versus the benefits of vaccine exemption, her failure to document with specificity the patient's need for a vaccine exemption, and the potential harm to public safety and safety to patients in New York should the Respondent practice medicine in New York. Given the seriousness of the Respondent's omissions, the Hearing Committee finds that the only appropriate penalty in this matter is revocation of the Respondent's license to practice medicine in the State of New York.

400. On September 18, 2024, Dr. Brody wrote to RIBMD to ask that his license to practice medicine in Rhode Island be reinstated.

401. On September 19, 2024, RIBMD's chief administrative officer replied to Dr. Brody, attaching an application for a medical license reinstatement and noting "that the Board

will require you to provide proof of meeting the requirements of your previous Consent Orders, including: 1. Successfully passing the CPEP PROBE course."

402. On November 21-23, 2024, Dr. Brody retook the CPEP PROBE course.

403. On December 19, 2024, Dr. Brody received a failing grade for his second attempt at the CPEP PROBE course. According to the course faculty:

> In his seminar performance and final essay, Dr. Brody has demonstrated a cursory and theoretical intellectual understanding of the material presented in PROBE. His essay fails to fulfill the most important essay requirement: to provide an ethical analysis of his own conduct from the perspective of the Board. His ability to apply this understanding to the allegations against him appears to have been hampered by his belief that scientific information about the COVID vaccine is totally flawed, that information he relies on is totally accurate, and that he acted honorably in advising all his patients against accepting this intervention. He demonstrates considerable difficulty imagining the perspectives of the Board, his colleagues, or his patients. The faculty are concerned that Dr. Brody has a limited capacity to see his infractions from the Board's perspective, and that he may not have a sufficient understanding of how to apply ethical reasoning to his professional behavior. Therefore, Mark Brody, M.D., has failed the PROBE Program.

404. On January 30, 2025, the Medical Licensing Board of Indiana voted 6-0 to indefinitely suspend Dr. Humiston's license to practice in Indiana pursuant to Indiana Code § 25-1-9-4(a)(7) and based on the MBC's revocation of his license to practice in California, finding that Dr. Humiston "may move for the reinstatement of his license only at a time during which he has an active California medical license."

405. The Medical Licensing Board of Indiana found, in relevant part:

> Respondent committed gross negligence and repeated negligent acts with respect to Patients C, D, E, and F in his issuance of vaccine exemptions for all childhood vaccines when no set of circumstances justified the issuance of such exemptions. Respondent believed it was within his discretion to issue a vaccine exemption if he felt it was appropriate and without reference to or regard for CDC guidelines, despite not having previously had training on how and when to issue a vaccine exemption.

## VII. Mary Talley Bowden

406. In response to the July 29, 2021 FSMB Censorship Statement threatening physician discipline for public disagreement with "consensus-driven" medical claims, Texas State Senator Bob Hall ("Senator Hall") wrote to Texas Medical Board president and FSMB director Defendant Sherif Zaafran ("Zaafran") in August 2021 with concerns that the FSMB Censorship Statement calls for "an unprecedented level of draconian restriction on physicians."

407. Senator Hall asked Zaafran for "assurance from the Texas Medical Board" that Texas physicians "will not be punished for doing their jobs," that they "have the freedom to report and share information as they see fit, without politically motivated restraints," and that they are allowed "to promote those therapeutic procedures that best serve their patients."

408. Zaafran responded in a qualified manner: "TMB is not interested in stifling physician-patient communication that meets the standard of care."

409. As an ear, nose, and throat doctor with an active private clinical practice, Houston-based Plaintiff Mary Talley Bowden was on the frontlines of the COVID-19 pandemic, having treated over 6,000 patients suffering from COVID-19 during the several surges.

410. According to Dr. Bowden:

> My mindset coming into the pandemic was [that] the research, the journals are a starting point, but the final say is your own clinical experience, and what you're seeing—and we had never seen COVID before. This was a brand-new entity, so we're learning on the fly; but I've never treated so many patients with a single disease in my career, and I'm sure I never will again, so you quickly become an expert.

411. Dr. Bowden began treating COVID-19 patients with monoclonal antibodies early in the pandemic, which she found to be effective at treating symptoms of the disease.

412. Later in the pandemic, when the federal government restricted the supply of monoclonal antibodies, Dr. Bowden started to use ivermectin and various other drugs to treat COVID-19 patients.

413. On March 5, 2021, the Food and Drug Administration ("FDA") began a public relations campaign to advise the public against using ivermectin to treat COVID-19.

414. After the FDA's public relations campaign, Dr. Bowden's opinion that ivermectin was effective for treating COVID-19 did not enjoy consensus support within the U.S. medical and scientific communities.

415. Dr. Bowden knew that the FDA had no power to regulate off-label use of approved drugs. She also knew that, while the research into ivermectin's effectiveness for COVID-19 was ongoing, the drug's safety for human use was well-proven. Therefore, she continued to use the drug in her COVID-19 treatment protocol and to publicly advocate for its use.

416. On October 22, 2021, Dr. Bowden received a request for a second professional opinion from the wife and surrogate decisionmaker of Jason Jones ("Deputy Jones"), a Tarrant County deputy sheriff who was critically-ill with COVID-19 and in a medically-induced coma at the Texas Health Huguley Hospital ("Huguley Hospital") in the Fort Worth area.

417. Dr. Bowden obtained information about Deputy Jones with Mrs. Jones, discussed the risks and alternatives of her treatment, and obtained informed consent from Mrs. Jones before prescribing ivermectin and several other drugs to Deputy Jones.

418. Although Mrs. Jones wished to try Dr. Bowden's prescribed treatment protocol, Huguley Hospital refused to administer it to Deputy Jones.

419. Mrs. Jones then petitioned in the Texas state courts for an order that Huguley Hospital honor her wishes and administer Dr. Bowden's prescriptions.

420. On October 26, 2021, a Texas state court issued a temporary restraining order ("TRO") requiring Huguley Hospital to administer ivermectin to Deputy Jones.

421. Huguley Hospital petitioned for mandamus to overturn the TRO, and meanwhile simply refused to obey the TRO while the petition was pending.

422. On October 27, 2021, Huguley Hospital filed a complaint against Dr. Bowden with the Texas Medical Board ("TMB"). The complaint claimed that Dr. Bowden had harmed Deputy Jones because:

> On 10-26-2021, spouse of patient Jason Jones (Erin) hand-delivered application for Temporary Restraining Order (TRO) filed in Tarrant County, Texas. TRO contains "Plaintiff has been prescribed lvermectin, and a true and correct copy of this prescription is attached hereto as Exhibit 1". Prescription Form (Exhibit 1) is signed by prescriber Mary Talley Bowden MD and contains lvermectin as well as 15 additional medications. TRO states "are compelled to immediately administer Jason Jones lvermectin in accordance with the prescription attached hereto as Exhibit A". Dr. Mary Talley Bowden does not nor has ever had privileges at Texas Health Huguley where Jason Jones is currently intubated and admitted to ICU. Furthermore, it is asserted that Mary Talley Bowden MD is practicing outside of her area of expertise as Jason Jones is in a critical care ICU COVID unit. We urge the TMB to investigate Mary Talley Bowden MD as such practice is inconsistent with the standards of safe care-delivery and is unethical. We also are seeking the monetary recovery of legal expenses incurred due to this aggreges [*sic*] misappropriation of legal effort during this unprecedented time of ongoing pandemic.

423. On November 1 and 2, 2021, a Texas state trial court held a temporary injunction hearing, at which Dr. Bowden and Texas State Senator Bob Hall both provided expert opinion testimony in support of the temporary injunction request.

424. Senator Hall testified that the Texas state legislature generally supports patients' rights to try non-conventional or experimental treatments, including those not approved by the

FDA, citing the bipartisan Right to Try Act, introduced as HB21 and signed into law in 2015.

425. Dr. Bowden testified that she had prescribed ivermectin for hundreds and treated thousands of COVID-19 patients in total, with excellent results.

426. During the temporary injunction hearing, on its own accord, the trial "court asked why the hospital would not permit Dr. Bowden to administer the treatment" to Deputy Jones herself, instead of having hospital staff do it. *Tex. Health Huguley, Inc. v. Jones*, 637 S.W.3d 202, 209 (Tex. App. 2021).

427. The trial court found the hospital's response to the question unpersuasive, so it "instructed Dr. Bowden to submit an application for temporary ICU privileges at Huguley, and the court indicated that it would require Huguley to grant the doctor such privileges." *Jones*, 637 S.W.3d at 211.

428. Dr. Bowden did so immediately, even though Huguley Hospital required her to submit a lengthy application for permanent privileges at the hospital.

429. Huguley Hospital then engaged in various dilatory tactics.

430. On November 4, 2021, Dr. Bowden wrote to Huguley Hospital:

> From what I understand, the hospital does not plan on granting me privileges. If this is the case, I would like to withdraw my application. If I am denied privileges, I have to report this in any subsequent hospital privilege applications. Given the circumstances, I would view denying my privileges as an attempt to prevent the patient from getting ivermectin rather than concern over my ability to provide competent medical care for patients.

431. On November 5, 2021, Huguley Hospital notified Dr. Bowden: "the Credentials Vice Chair, President of the Medical Staff and Department of Surgery Chair have all declined to grant you temporary privileges. We will continue to process your application in its entirety. This is not a denial of your application."

432. Due to the negative professional consequences of a denial of privileges, Dr. Bowden formally withdrew her application for permanent privileges at Huguley.

433. On November 6, 2021, Dr. Bowden wrote an open letter to her patients and posted it on social media. The letter stated, in part:

> Yesterday was a turning point for me as a physician. Earlier this week, I testified on behalf of a dying father of 6 who was being refused ivermectin by his treating physicians. The judge ruled in our favor, telling the hospital's lawyer that I was to be granted temporary privileges and allowed to administer medications to my patient. . . . [Y]esterday afternoon Texas Huguley hospital in Ft Worth, TX informed me that my request for privileges was denied.

434. Dr. Bowden's letter drew intense public interest and press coverage across the United States.

435. On November 7, 2021, Mrs. Jones's attorneys wrote to the Texas trial court to complain that Huguley Hospital was "refusing to comply with Your Honor's Decision."

436. On November 8, 2021, the Texas trial court issued a written temporary injunction expressly ordering that "Dr. Bowden and/or her nurse working under her authority, is granted access in the ICU at Texas Health Huguley Hospital to Jason Jones for the sole purpose of administering ivermectin."

437. The court ordered that Huguley Hospital "shall grant Dr. Mary Talley Bowden, M.D. and/or her nurse working under her authority, temporary emergency privileges, which shall not be unreasonably delayed or denied, solely to administer Ivermectin to Jason Jones, pursuant to the order and the attached Prescription of Dr. Bowden."

438. Late on November 9, 2021, the Texas Second Court of Appeals stayed the temporary injunction.

439. On November 10, 2021, acting under the belief that the November 8, 2021 temporary injunction remained valid, Dr. Bowden sent a nurse to Huguley Hospital to administer the ivermectin to Deputy Jones.

440. Dr. Bowden also posted on Twitter: "Dallas/Ft Worth news stations. My nurse is headed to Texas Huguley Hospital with court order to give my patient the medication. Coverage would be appreciated."

441. At about 5:55 p.m., the nurse arrived at the intensive care unit information desk, where she was met by the patient's wife and the hospital's chief nursing officer, Jason Cain ("Cain").

442. Dr. Bowden's nurse showed Cain a copy of the November 8, 2021 temporary injunction and told him that she was there to administer ivermectin to Deputy Jones.

443. Cain responded by ordering the hospital's security to detain Dr. Bowden's nurse and call the police.

444. At 6:04 p.m., according to a Fort Worth Police Department incident report, a security manager at Huguley Hospital reported: "UNAUTHORIZED 'NURSE' …ATTEMPTING TO DELIVER MEDS TO A PATIENT …..SECURITY HAS HER DETAINED ……SUBJ IS IN THE MEDICAL ICU LOBBY."

445. Dr. Bowden's nurse began recording video on her cell phone shortly after arrival. The video shows Cain standing in a public lobby near an information desk with Mrs. Jones and Dr. Bowden's nurse, who has the court order in hand. Cain tells the nurse that he would call police if she entered the ICU. The nurse does not enter the ICU, and instead asks Mrs. Jones to call her attorney. Cain then escorts the nurse to an empty lobby waiting area, where she sits quietly as Mrs. Jones calls her attorney and talks with Cain.

Cain then informs Mrs. Jones that there is a stay, refuses to show her a copy of the stay, and taunts her that he is "happy to show the police if they come."

446. A second video then shows Dr. Bowden's nurse sitting in the empty waiting area and quietly talking with Mrs. Jones as police officers arrive at 6:16 p.m., according to the police report. The police officers review copies of both the preliminary injunction and the stay, then explain the legal consequences of the stay to the nurse.

447. The police officers tell the nurse that the hospital can ask her to leave. The nurse says, "I'll leave."

448. According to the Fort Worth Police Department's incident report: "the nurse in question left once she was asked to."

449. At 8:36 p.m., Dr. Bowden posted a picture of Cain in a surgical mask with the text: "This is the director of the ICU at Texas Huguley Hospital who called the police on my nurse."

450. The following morning, November 11, 2021, Huguley Hospital filed a complaint against Dr. Bowden's nurse with the Texas Board of Nursing, claiming that Dr. Bowden's nurse

> attempted to gain entry into the hospital's Medical ICU for the sole purpose of administering an unknown substance into our intubated, critically ill patient's NGT. [The nurse al]luded to the substance as being Ivermectin. . . . The Ivermectin issue with the patient in question continues to be in litigation with a STAY currently in [e]ffect. A copy of this STAY was produced and shown to the wife of the patient and to [the nurse. The nurse] continued to be unprofessional and refused to leave premises. Law Enforcement was summoned to issue a Trespass Warning. [The nurse] did leave prior to trespass warning issuance. Photos of hospital leadership taken by [the nurse] were then posted to social media outlets including Twitter where nursing leadership depicted in photos were described as "assholes".

451. Huguley Hospital also forwarded a copy of the Texas Board of Nursing complaint and several screenshots of Dr. Bowden's social media posts to TMB.

452. On November 18, 2021, the Texas Second Court of Appeals ruled that "the trial court had no legal authority to intervene in Huguley's legal exercise of its discretion to grant, deny, or limit Dr. Bowden's ICU credentials." *Tex. Health Huguley, Inc. v. Jones*, 637 S.W.3d 202, 224 (Tex. App. 2021).

453. Deputy Jones thus remained entirely in Huguley Hospital's care, did not receive ivermectin, and died two years later from complications related to his COVID-19 illness.

454. On December 22, 2021, a Huguley Hospital official falsely claimed in a complaint to TMB that Dr. Bowden's nurse caused "a profoundly disruptive scene at our facility, which required a response by the Fort Worth Police Department when Dr. Bowden's nurse delegate refused to leave the premises.

455. The Hugueley Hospital also shared with the TMB "just a small portion of the comments posted by [Dr. Bowden] on social media," which it claimed led to the hospital and one of its physicians "receiving numerous harassing, and some threatening, phone calls, emails, and social media posts."

456. Because Dr. Bowden's second opinion and expert testimony concerning Deputy Jones's treatment with ivermectin violated the FSMB Censorship Policy by publicly contradicting what the FSMB's national leadership considers to be the prevailing scientific consensus, TMB and Zaafran initiated disciplinary proceedings against Dr. Bowden.

457. On April 25, 2023, TMB filed a complaint against Dr. Bowden with the Texas State Office of Administrative Hearings ("SOAH").

458. TMB used two anonymous "experts" to substantiate the allegations in its complaint, with the second anonymous individual merely rubber stamping the first's opinion.

459. The final expert report accused Dr. Bowden of "[p]rescribing a drug that has been shown to be of no benefit in COVID-19 infection, to the contrary carries significant toxicity and has clear directives from professional organizations and regulatory agencies against its use."

460. The TMB's complaint against Dr. Bowden omitted all mention of the Texas state court litigation filed by the patient's wife, and of the consequent temporary injunction granting Dr. Bowden "access in the ICU at Texas Health Huguley Hospital to [the patient] for the sole purpose of administering ivermectin." This made it seem like Dr. Bowden was acting on her own accord, instead of pursuant to a court order.

461. TMB alleged, in relevant part: "Respondent sent her delegate to administer the prescription medication to the patient at the hospital, despite having no treating privileges at the hospital, nor having established a physician-patient relationship with the patient."

462. In fact, it was not "Respondent [who] sent her delegate to administer the prescription medication to the patient at the hospital," but a Texas state judge by means of a temporary injunction, which had given Huguley Hospital no discretion to deny Dr. Bowden's privileges. Dr. Bowden's own role was limited to providing expert opinion testimony and obeying a court order. None of these facts were mentioned anywhere in TMB's complaint.

463. TMB also alleged to SOAH that, "[o]n November 10, 2021, in response to Respondent's nurse's unauthorized presence at Huguley Hospital and refusal to leave, hospital staff called the Fort Worth Police Department, resulting in a disruptive scene."

464. TMB made this allegation despite knowing, or having should have known, from the Fort Worth Police Department incident report that this allegation was false, and that "the nurse in question left once she was asked to.

465. TMB also alleged that "Respondent used her Twitter account, a public forum, to disseminate pictures of Huguley Hospital staff."

466. In its complaint, TMB claimed these allegations show that Dr. Bowden violated six different provisions of the Texas Medical Practice Act, including various rules concerning disruptive behavior, the standard of care, establishing a patient/physician relationship, and prescription of dangerous or controlled drugs.

467. Under the "disruptive behavior" charge, Texas Occupations Code, § 164.052(a)(5) and TMB Rule 190.8(2)(P), Dr. Bowden was accused of "behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family members or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient."

468. TMB also alleged Dr. Bowden violated Texas Occupations Code, § 164.053(a)(5) by "[p]rescribing or administering a drug or treatment that is non-therapeutic," and § 164.53(a)(6), by [p]rescribing, administering, or dispensing in a manner inconsistent with public health and welfare dangerous drugs."

469. TMB's pursuit of its initial allegations against Dr. Bowden ran into several roadblocks.

470. First, in 2023, the Texas Board of Nursing closed its investigation into Dr. Bowden's nurse based on the November 10, 2021 incident at Huguley Hospital and expunged the hospital's complaint against the nurse.

471. Unlike Dr. Bowden, her nurse had not provided expert testimony in a court case concerning the use of ivermectin to treat COVID-19, and had not posted about the court case on social media.

472. Second, on September 1, 2023, in *Apter v. HHS*, 80 F.4th 579 (5th Cir. 2023), the U.S. Court of Appeals for the Fifth Circuit ruled in favor of Dr. Bowden and two other doctors in an *ultra vires* action challenging the FDA's authority to issue statements discouraging the treatment of COVID-19 with ivermectin.

473. Dr. Bowden and her co-plaintiffs had alleged in *Apter* that the FDA's campaign "interfered with their individual 'ability to exercise professional medical judgment in practicing medicine'" and "harmed their reputations." *Apter*, 80 F.4th at 585.

474. The FDA settled with Dr. Bowden and "retired" its anti-ivermectin public relations campaign.

475. Third, two expert witnesses retained by TMB refused to give public testimony concerning the applicable standard of care for treating COVID-19 with ivermectin. A third expert, TMB's own medical director, withdrew as a witness and retired from his position at TMB after Dr. Bowden discovered that he was moonlighting as a laboratory director for Planned Parenthood, raising concerns about his independence.

476. Fourth, Dr. Bowden's defense counsel relied on the temporary injunction that ordered Huguley Hospital to grant Dr. Bowden privileges and access to Deputy Jones, on the nurse's video from November 10, 2021 showing no disruption, as well as on the fact that she and her nurse complied with the appeals court's stay of the order immediately upon notice.

477. In response to the first three issues, TMB dropped all but the disruptive behavior charge.

478. Concerning the fourth, TMB argued, illogically, that SOAH must disregard all of the trial court's orders, from the October 26, 2021 TRO to the November 8, 2021 temporary injunction, because the subsequent November 18, 2021 appeals court ruling, *ex post facto*, retroactively invalidated the trial court orders as if they never existed. Thus, not only Dr. Bowden's efforts to administer ivermectin to Deputy Jones in compliance with the temporary injunction prior to learning of its stay, but also the trial court's own intent that Dr. Bowden give Deputy Jones the ivermectin, must be imputed to Dr. Bowden, and not to the trial court.

479. In a December 12, 2024 Second Motion for Partial Summary Disposition, TMB therefore argued:

> There is much noise surrounding the proposed use of Ivermectin and whether there was a proper physician/patient relationship. But those issues have no bearing the issue of hospital privileges. . . . The Appeals Court found that the hospital cannot be forced to credential Dr. Bowden. . . . Because the issue of the hospital privileges was judicially determined by the 2nd Appellate Court, the defense regarding those privileges cannot and should not be relitigated in this forum. . . . Huguley cannot be forced to grant her privileges, any defense to the contrary at SOAH is conclusively negated by the Appeals Court opinion.

480. Remarkably, TMB urged SOAH to apply *res judicata* and collateral estoppel principles to conduct that pre-occurred the supposedly preclusive judgment prohibiting the conduct, arguing: "There is no question the Second Court of Appeals is a court of competent jurisdiction. The issue of hospital privileges were [*sic*] litigated and the Court established Huguley cannot be forced to credential Dr. Bowden."

481. SOAH agreed with TMB, finding on March 12, 2025 that, although it accepts "as true that Respondent did not know the Court of Appeals stayed the Temporary Injunction Order," it is "immaterial that Respondent did not know the Order was stayed" because "[t]he Order did not grant Respondent hospital privileges" in the first place.

482. Applying the Texas appeals court opinion *ex post facto*, SOAH concluded that, as a matter of law, "[o]nly Huguley Hospital's governing body has the authority to grant or deny privileges to a physician, such as Respondent, in its hospital." Therefore, according to SOAH, the "Temporary Injunction Order did not grant Respondent privileges to treat Patient in the Hospital. Because Respondent had no privileges in Huguley Hospital, her conduct in attempting to treat an inpatient in the Hospital interfered with patient care."

483. Based on the TMB's allegations and the Appeals Court opinion, SOAH found that Dr. Bowden engaged in unprofessional or dishonorable conduct that is likely to injure the public in violation of §§ 164.051(a)(1) and .052(a)(5) of the Texas Medical Practice Act:

> Lacking privileges in Huguley Hospital, Respondent's conduct in dispatching . . . her nurse, to Huguley Hospital's ICU to administer a medication to Patient interfered with the Hospital's patient care. Hospital personnel were required to take action to stop Respondent's nurse's entry to the ICU, including calling law enforcement. The evidence conclusively establishes that Respondent behaved unprofessionally and in a disruptive manner toward licensees and hospital personnel that interfered with patient care and could be reasonably expected to adversely impact the quality of care rendered to a patient.

484. By completely writing the Texas trial court out of the picture, TMB and SOAH were able to transfer the trial court's intent improperly onto Dr. Bowden:

> When Respondent sent her nurse to the ICU to administer a medication to Patient, Respondent aimed to intervene in the care of an inpatient at Huguley Hospital. . . . Respondent's intended result was to override the Hospital's care plan for Patient by administering her drug prescription to Patient. That Patient did not receive the drug simply highlights that Respondent's obstruction did not bear fruit. Respondent was unable to bring about the result she intended. Instead, the Hospital stopped Respondent's nurse. And Patient remained in the care of health professionals privileged to work in the Hospital.

485. As the Texas appeals court had ruled, however, it was the ***trial court's*** aim to intervene in the care of an inpatient at Huguley Hospital, not Dr. Bowden's; and it was the appeals

court's stay, not the Hospital's call to the police, that had stopped the trial court's intervention and retained the patient in the Hospital's care.

486. Dr. Bowden's own conduct was limited to testifying before the trial court that the patient should receive the drug, to testifying that she was willing to administer the drug, and to acting pursuant to the trial court's consequent order.

487. In acting pursuant to the trial court's order, neither Dr. Bowden nor her nurse engaged in any non-expressive conduct. The nurse did not enter the ICU or administer the medication. She showed the court order to hospital staff and quietly sat waiting in a public area while the patient's wife—not the nurse—spoke with hospital staff concerning the order and the stay. The nurse left as soon as she was asked to leave.

488. On June 1, 2025, the Texas House of Representatives passed H.R. No. 1138, commending Dr. Bowden for her contributions to the treatment of COVID-19 patients and stating:

> WHEREAS, Dr. Mary Talley Bowden, a board-certified otolaryngologist and sleep specialist in Houston, has dedicated her medical practice to the well-being of patients, particularly during the COVID-19 pandemic; . . . and she has successfully treated more than 6,000 COVID-19 patients using early intervention strategies, which have contributed to reduced hospitalizations and improved patient recovery with no loss of life; . . . now, therefore, be it RESOLVED, That the House of Representatives of the 89th Texas Legislature hereby commend Dr. Mary Talley Bowden for her contributions to the treatment of COVID-19 patients through early intervention protocols and for her continued commitment to patient care and medical innovation.

489. On August 7, 2025, SOAH ruled that Dr. Bowden's intentional conduct and her refusal to acknowledge any wrongdoing for her contributions to the treatment of COVID-19 patients, added to Dr. Bowden's speech on social media, both constituted aggravating circumstances in her case:

> Respondent intended disruption when she disregarded Huguley Hospital's privileging process to intervene in the care of Patient and override the Hospital's care plan for Patient. Respondent knew that the Hospital had the final say in authorizing who could treat patients in its facilities. She knew that she did not have privileges at the Hospital. Respondent took to social media to request local news coverage of her nurse's arrival at the Hospital. Thus, the record contradicts Respondent's contention that she did not believe sending the nurse to the Hospital would cause a disruption. . . . Despite all of this, Respondent declared that she would not act differently in the future, nor has she learned anything from this process. This raises a legitimate concern that Respondent, based on her disagreement with an inpatient's treatment plan, may repeat her attempt to disregard a hospital's rules on physician credentialing and treat an inpatient at a facility where she is not privileged.

490. On August 15, 2025, Texas State Senator Bob Hall and Texas State Representative Joanne Shofner filed bills S.B. 29 and H.B. 25, which would allow Texas pharmacies to dispense ivermectin without a prescription and forbidding professional disciplinary action against pharmacists who do so in a reasonably prudent manner.

491. On August 20, 2025, Texas Governor Greg Abbott added "[l]egislation to authorize a person to purchase Ivermectin at a pharmacy" to his agenda for the 89th Legislature's second special session.

492. On September 17, 2025, Governor Abbott signed the ivermectin legislation into law, effective December 4, 2025.

493. On October 17, 2025, TMB and Zaafran publicly reprimanded Dr. Bowden for her alleged unprofessional and disruptive conduct pursuant to Texas Occupations Code, § 164.001(3).

494. Zaafran spoke at the reprimand hearing, repeating TMB's *ex post facto* legal fiction and making other false claims:

> The respondent was not granted privileges in a court of law to treat the patient at that facility. . . . Despite claims to the contrary, the board has never, ever been concerned with the type of treatment the respondent was attempting to provide, and I believe I made multiple, multiple statements to that effect. We do not care

> what type of treatment is being provided, and that was never the case in this specific case also. TMB would have brought this same case against any other physician attempting to treat a patient in a hospital without privileges regardless of the circumstances or the treatment.

495. Dr. Bowden notified TMB of the imminent filing of the instant complaint.

**VIII. Richard Wilkinson**

496. On September 22, 2021, the Washington Medical Commission ("WMC") adopted a COVID-19 "Misinformation" position statement based on and endorsing the FSMB Censorship Statement.

497. The statement read, in part:

> The WMC supports the position taken by the Federation of State Medical Boards (FSMB) regarding COVID-19 vaccine misinformation. The WMC does not limit this perspective to vaccines but broadly applies this standard to all misinformation regarding COVID-19 treatments and preventive measures such as masking. Physicians and Physician Assistants, who generate and spread COVID-19 misinformation, or disinformation, erode the public trust in the medical profession and endanger patients.
>
> The WMC will scrutinize any complaints received about practitioners granting exemptions to vaccination or masks that are not based in established science or verifiable fact. A practitioner who grants a mask or other exemption without conducting an appropriate prior exam and without a finding of a legitimate medical reason supporting such an exemption within the standard of care, may be subjecting their license to disciplinary action.
>
> The WMC bases masking and vaccination safety on expert recommendations from the U.S. Centers for Disease Control and Prevention (CDC) and the Washington State Department of Health (DOH).
>
> The WMC relies on the U.S. Food and Drug Administration approval of medications to treat COVID-19 to be the standard of care. While not an exhaustive list, the public and practitioners should take note:
>
> • Ivermectin is not FDA approved for use in treating or preventing [COVID-19
> • Hydroxychloroquine (Chloroquine) is not FDA approved for use in treating or preventing COVID-19.

> The public and practitioners are encouraged to use the WMC complaint forms when they believe the standard of care has been breached.

498. From June 2020 through May 2022, Dr. Wilkinson maintained a website blog that posted medical information to the public with the purpose of sharing his views on COVID-19. The public accessed the blog only through the Wilkinson Wellness Clinic website. Many, if not most, of the blog postings from 2020 through 2022 address the topic of COVID-19.

499. Some of the claims that Dr. Wilkinson made on his website were:

> The COVID-19 pandemic is a scam;
>
> Polymerase chain reaction (PCR) testing and the use of masks to reduce the spread of COVID-19 infection are useless;
>
> Public health entities, including the Food and Drug Administration, the Washington State Department of Health, and the Yakima County Health Department, are providing false information and are not to be trusted;
>
> Ivermectin is effective in preventing or treating a COVID-19 infection; and
>
> COVID-19 vaccines are dangerous and kill people, comparing the push for vaccination with the murder of Jewish people in Nazi-era Germany.

500. In addition to criticizing conventional medical wisdom about COVID-19, Dr. Wilkinson also promoted and prescribed ivermectin to treat COVID-19.

501. On June 7, 2022, the WMC served a statement of charges against Dr. Wilkinson.

502. The charges alleged that Dr. Wilkinson's "public false and misleading statements regarding the COVID-19 pandemic, COVID-19 vaccines, and public health officials are harmful and dangerous to individual patients, generate mistrust in the medical profession and in public health, and have a wide-spread negative impact on the health and well-being of our communities."

503. The charges also alleged that Dr. Wilkinson provided negligent care to seven patients when treating their COVID-19 infections with ivermectin, including by not discussing

"possible alternative treatments for a COVID-19 infection," and by not informing patients that "the FDA has not approved ivermectin for a COVID-19 infection, that the prescribing of ivermectin for an unapproved condition is off-label," as well as by not providing the patients with "evidence supporting the off-label use of ivermectin."

504. Five of the patients survived. Two, a 91-year-old and a 65-year-old with a history of smoking, died.

505. The WMC refused to dismiss the blog posts charge on First Amendment grounds.

506. A five-day hearing occurred before a hearing panel consisting of three WMC members, and chaired by Defendant Trescott, between April 3 and 7, 2023.

507. The complaints concerning the seven patients all had come from other physicians, and not the patients themselves.

508. The Commission presented testimony from five physicians who treated Patients A-G in the hospital and from three expert witnesses.

509. Dr. Wilkinson presented testimony in his support from all seven of the allegedly harmed patients or their family members and friends.

510. Dr. Raymond McClelland, one of WMC's own experts, testified that opinions about COVID and treatment of COVID reveal the speaker's political affinities. During the COVID-19 pandemic, one political party embraced pro-ivermectin, antimasking, and antivaccine stances. The debate over the seriousness of COVID-19 and what constituted effective COVID-19 treatments deserted the tether of science and curved political.

511. Nevertheless, on August 12, 2023, Trescott found on behalf of the WMC panel that, as a matter of fact:

> The Respondent made numerous false and misleading statements on his blog regarding the COVID-19 pandemic, COVID-19 vaccines, and public health

> officials. These statements—which in context can only be characterized as constituting the practice of medicine—were harmful and dangerous to individual patients, generated mistrust in the medical profession and in public health, and had a widespread negative impact on the health and well-being of the community.
>
> Much of the information that the Respondent spread via his blog was not factual, scientifically grounded, or consensus driven. However, due to their specialized knowledge and training, licensed physicians possess a high degree of public trust and therefore have a powerful platform in society. Physicians also have an ethical and professional responsibility to practice medicine in the best interests of their patients and must share information that is factual, scientifically grounded, and consensus-driven for the betterment of the public. When physicians spread inaccurate information and rely on their status as licensed physicians to bolster their message, it is especially harmful as it threatens the health and well-being of the community and undermines public trust in the profession and established best practices in care. See Exhibit D-41. Here, the Respondent spread inaccurate information via his blog, relying on his status as a physician to spread the misinformation.

512. ¶Based on its findings of fact and conclusions of law, the WMC panel ruled that Dr. Wilkinson violated former Revised Code of Washington §§ 18.130.180(1), (4), and (13).

513. According to the WMC panel, Dr. Wilkinson violated former Revised Code of Washington § 18.130.180(1) as follows:

> Here, the Respondent's presentations presented an extremely unbalanced look at COVID-19, downplaying the seriousness of COVID-19. The claims that medical records were falsified by hospitals undermines trust in the healthcare system and may delay patients from seeking necessary care. Similarly, the Respondent's posts about masks were likely to lead to people being less likely to wear masks when they should have been.
>
> The Respondent also significantly misrepresented information about COVID vaccines. This included claims that COVID vaccines could cause birth defects and infertility, and that somehow COVID vaccines were not really vaccines. In addition, the Respondent's comparison of COVID vaccines to the mass murder of Jewish people in the Holocaust was objectively untrue and patently offensive. The Respondent has clearly violated commonly accepted standards of honesty. All of this behavior raises concerns that the Respondent may use his professional position as a physician to harm members of the public. It also tends to lower the standing of physicians in the eyes of the public. Consequently, his actions "relate to" the medical profession. Consequently, the Commission has proved by clear and convincing evidence that the Respondent committed unprofessional conduct as defined in RCW 18.130.180(1).

514. According to the WMC panel, Dr. Wilkinson's

> presentation contained multiple falsehoods about COVID-19. The Respondent knew (or as a reasonably prudent physician, should have known) that much of the information he was presenting about COVID-19 was a misrepresentation of the true facts. Consequently, the Commission has proved by clear and convincing evidence that the Respondent violated RCW 18.130.180(13).

515. The WMC panel also found that Dr. Wilkinson in addition to finding that Dr. Wilkinson violated former Revised Washington Code § 18.130.180(4) by violating the standard of care with regard to the seven patients, including by "a persistent failure to engage in an informative discussion of the off-label use of ivermectin with his patients."

516. Based on its findings, the WMC panel placed Dr. Wilkinson's license on probation for at least 5 years and restricted his practice during the probationary period by restricting Dr. Wilkinson from prescribing ivermectin for non-FDA-approved indications and restricting him from prescribing medication or care to patients without first taking a number of enumerated steps, including establishing a physician/patient relationship, taking an appropriate history and obtaining informed consent.

517. The WMC panel also required Dr. Wilkinson to submit to "screening examinations, including at a minimum a history and physical, as well as cognitive and psychological screening" from the University of California at San Diego "Physician Assessment and Clinical Education" ("PACE") program.

518. Dr. Wilkinson timely sought judicial review of the WMC panel's order in Washington State courts.

519. On December 9, 2024, December 13, 2024, and March 19, 2025, Dr. Wilkinson participated in a PACE program assessment.

520. The lead medical doctor on Dr. Wilkinson's PACE assessment team, Sarah Merrill (Merrill), is active in Democratic Party politics, having donated to former U.S. Rep. Katie Porter's California U.S. Senate Campaign and to California Governor Gavin Newsom's Campaign for Democracy PAC, whose website states: "America is in an existential struggle for democracy. Across the country, extremist Republicans are systematically attacking the very foundations of a free society. . ."

521. Although Dr. Wilkinson received very good scores from an integrative medicine practitioner affiliated with the PACE program, Merrill awarded Dr. Wilkinson a failing grade on his PACE assessment, alleging that "his performance on cognitive screening measures indicated the need for further neuropsychological evaluation," and that "the physician could have a physical or mental health problem that prevents him/her from practicing safely," thereby being "a potential danger to their patients."

522. On September 5, 2025, the WMC's presiding officer ordered Dr. Wilkinson to undergo an investigative mental examination.

523. On September 16, 2025, the Court of Appeals of Washington, Division Three, reversed and dismissed the charges brought against Dr. Wilkinson by the WMC for his clinic's website blog comments and remanded to the WMC to reconsider the sanctions to impose for violating the standard of care with the seven patients. *See Wilkinson v. Washington Med. Comm'n'n*, 35 Wash. App. 2d 350, 354 (2025) (*rev. denied*, Apr. 1, 2026).

524. On March 6, 2026, Dr. Wilkinson received a forensic neuropsychological evaluation from Kenneth Muscatel, a PhD in clinical, forensic, and neuropsychology.

525. While he was a frequent Democrat donor in the 1980s and 1990s, Muscatel has not donated to Democratic or any political candidate since 2007.

526. On April 1, 2026, the Washington Supreme Court denied the WMC's petition for review of Division Three decision.

527. On May 6, 2026, Muscatel reported that Dr. Wilkinson's "current intellectual skills are in the Superior range," that his "evaluation does not indicate any neuropsychological evidence of neurocognitive impairment or decline relative to his age/gender/education cohort," as well as that "the current results are not with the cognitive concerns noted in the prior screen cognitive examination [by Merrill], and it should be noted that the current examination and results reflect a more extensive and comprehensive evaluation."

528. Nevertheless, Muscatel diagnosed Dr. Wilkinson with an "Unspecified Personality Disorder, including histrionic features [(]and idiosyncratic thinking and behavior)," based on his assessment that Dr. Wilkinson has "a strong need to pursue unusually challenging endeavors and evince goal directed behaviors which most others would find unrealistic"; that Dr. Wilkinson "is frequently able to coax others into doing things that they would not otherwise do"; and that "any uncertainty he may possess . . . [is] generally relegated to suppressed unawareness."

529. According to the Hogg Foundation for Mental Health at the University of Texas in Austin, "punitive psychiatry" was the systematic political abuse of psychiatry in the Soviet Union in the 1970s and 1980s, when "[d]octors would diagnose political dissenters with "sluggish schizophrenia," . . . [and claim that p]atients suffering from this form of schizophrenia, which has long been discredited for its scientific inaccuracy, were said to exhibit 'grandiose ideas of reforming society,' along with other symptoms like 'reform delusions,' 'struggle for truth,' and 'perseverance.'"

**COUNT I**
**(Viewpoint Discrimination under the First and Fourteenth Amendments in Violation of 42 U.S.C. § 1983)**

530. Plaintiffs hereby reallege and incorporate herein all of the allegations contained in paragraphs 1-529 as if fully set forth herein.

531. By revoking, suspending, or otherwise restricting the medical licenses of the following Plaintiffs with the purpose of suppressing these Plaintiffs' communication of non-consensus medical professional viewpoints in public communications and/or clinical settings, the following Defendants discriminated and are discriminating against these Plaintiffs based on the content and viewpoint of the Plaintiffs' speech under the color of their respective state laws, depriving them of their First and Fourteenth Amendment rights:

a. MBC and Kirchmeyer discriminated and are discriminating against Dr. Sutton and Dr. Humiston by revoking their California medical licenses with the purpose of suppressing their statements recommending medical exemptions from childhood vaccinations based on reasons not recommended under the pre-2025 ACIP/AAP consensus, thereby depriving Dr. Sutton and Dr. Humiston of their First and Fourteenth Amendment Rights in violation of 42 U.S.C. § 1983, and causing them injury.

b. BORIM and Robinson discriminated and are discriminating against Dr. Sutton by revoking her Massachusetts medical license with the purpose of suppressing her statements recommending medical exemptions from childhood vaccinations based on reasons not recommended under the pre-2025 ACIP/AAP consensus, thereby

depriving Dr. Sutton of her First and Fourteenth Amendment Rights in Violation of 42 U.S.C. § 1983, and causing her injury.

c. NBPMC and Merritt discriminated and are discriminating against Dr. Sutton by revoking her New York medical license with the purpose of suppressing her statements recommending medical exemptions from childhood vaccinations based on reasons not recommended under the pre-2025 ACIP/AAP consensus, thereby depriving Dr. Sutton of her First and Fourteenth Amendment Rights in Violation of 42 U.S.C. § 1983, and causing her injury.

d. MLBI and Strobel discriminated and are discriminating against Dr. Humiston by suspending his Indiana medical license with the purpose of suppressing his statements recommending medical exemptions from childhood vaccinations based on reasons not recommended under the pre-2025 ACIP/AAP consensus, thereby depriving Dr. Humiston of his First and Fourteenth Amendment Rights in Violation of 42 U.S.C. § 1983, and causing him injury.

e. RIBMLD and Alexander-Scott discriminated and are discriminating against Dr. Brody by revoking his Rhode Island medical license with the purpose of suppressing his statements casting doubt on the prevailing contemporary scientific consensus that the Pfizer COVID-19 vaccine was safe and effective, thereby depriving Dr. Brody of his First and Fourteenth Amendment Rights in Violation of 42 U.S.C. § 1983, and causing him injury.

f. BORIM and Robinson discriminated and are discriminating against Dr. Brody by revoking his Massachusetts medical license with the purpose of suppressing his newsletter statements casting doubt on the prevailing contemporary scientific

consensus that the Pfizer COVID-19 vaccine was safe and effective, thereby depriving Dr. Brody of his First and Fourteenth Amendment Rights in Violation of 42 U.S.C. § 1983, and causing him injury.

g. TMB and Saafran discriminated and are discriminating against Dr. Bowden by restricting her Texas medical license with a reprimand with the purpose of suppressing her expert testimony in state court against the prevailing scientific consensus on the safety and effectiveness of the drug ivermectin in treating COVID-19, thereby depriving Dr. Bowden of her First and Fourteenth Amendment Rights in Violation of 42 U.S.C. § 1983, and causing her injury.

h. WMC and Trescott discriminated and are discriminating against Dr. Wilkinson by restricting his Washington medical license with probation and various conditions, including a requirement that he submit to an investigative mental examination, with the purpose of suppressing his blog and clinical statements against the prevailing scientific consensus concerning the COVID-19 pandemic and COVID-19 vaccines, concerning the safety and efficacy of ivermectin at treating COVID-19, and concerning public health officials, thereby depriving Dr. Wilkinson of his First and Fourteenth Amendment Rights in violation of 42 U.S.C. § 1983, and causing him injury.

532. Drs. Sutton, Humiston, Brody, Bowden, and Wilkinson wish to continue providing medical information in public and clinical settings, including non-consensus medical professional viewpoints, but are subject to ongoing restrictions on their abilities to do so due to the revocation, suspension, reprimand, condition, or other restriction on each of their medical licenses.

533. PPRM member physicians who wish to communicate non-consensus medical professional viewpoints in public communications and/or clinical settings fear that they too will be disciplined by FSMB Member Medical Boards under the FSMB Censorship Policy and the FSMB's other rules and regulations, as applied to their states' medical practice laws, if they do so.

534. PPRM member patients who wish to seek and receive independent, uncensored advice and treatment from the patient's chosen physician are unable to do so due to FSMB Censorship Policy and the FSMB's other rules and regulations, as applied by FSMB Member Medical Boards to their states' medical practice laws.

535. Therefore, all Defendants except Charity Dean, FSMB, Katie Templeton, and Kenneth Simons have engaged and are engaging in an ongoing deprivation of Plaintiffs' First and Fourteenth Amendment Rights in Violation of 42 U.S.C. § 1983, causing them injury.

**COUNT II**
**(Conspiracy to Discriminate Based on Viewpoint in Violation of 42 U.S.C. § 1983)**

536. Plaintiffs hereby reallege and incorporate herein all of the allegations contained in paragraphs 1-535 as if fully set forth herein.

537. The FSMB, Templeton, and Simons were willful participants in joint unconstitutional activity with the individual state Defendants, as well as with FSMB Member Medical Board Defendants, whereby all Defendants jointly agreed to implement the FSMB Censorship Statement, the FSMB Censorship Policy, and their predecessor censorship agreements during the COVID-19 pandemic, with the purpose of suppressing physician communication and/or patient receipt of non-consensus medical professional viewpoints in public communications and/or clinical settings.

538. Pursuant to these joint agreements, the state Defendants and FSMB Member Medical Boards did and continue to restrict Plaintiff physicians' licenses to practice medicine based on the content and viewpoints of Plaintiffs physicians' speech, causing an ongoing deprivation of all Plaintiffs' First and Fourteenth Amendment rights, in violation of 42 U.S.C. § 1983.

539. PPRM member physicians who wish to communicate non-consensus medical professional viewpoints in public communications and/or clinical settings fear that they too will be disciplined in furtherance of this conspiracy if they do so.

540. PPRM member patients who wish to seek and receive non-consensus medical professional viewpoints in public communications and/or clinical settings from the patient's chosen physician have been unable to do so due to the existence of this conspiracy.

541. Therefore, all Defendants have engaged and are engaging in a conspiracy to deprive all Plaintiffs of their First and Fourteenth Amendment Rights in Violation of 42 U.S.C. § 1983, causing them injury.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that this Court:

a) enter judgment in their favor and against Defendants pursuant to 42 U.S.C. § 1983.

b) require Defendant medical board members, in their official capacities, to remove all restrictions from Plaintiff physicians' licenses to practice medicine in their respective states by restoring them to their *status quo ante* prior to the discipline complained of herein;

d) award the several Plaintiffs monetary damages against the individual State Defendants, in their personal capacities, as well as against the FSMB, Templeton, and Simons, jointly and severally, in an amount to be determined at trial, with interest, reasonable attorney's fees and costs; and

e) grant any other relief that the Court deems proper, including but not limited to, punitive damages for malicious deprivation of Plaintiffs' First and Fourteenth Amendment rights.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,
Plaintiffs,
By their attorneys,

Ilya I. Feoktistov
Law Office of Ilya Feoktistov
60 Burnham Drive
Falmouth, MA 02540
(617) 462-7938
if@ilyafeoktistov.com

Nayeem N. Mohammed
Law Office of Nayeem N. Mohammed
539 W. Commerce St., No. 1899
Dallas, TX 75208
972-767-9099
nayeem@nnmpc.com

DATED: June 14, 2026.